FRIENDS OF the SHAWANGUNKS, INC., Sarah L. Johnston, John Johnsen, Keith LaBudde, and Frank Wright, Appellants,

v.

William CLARK, Secretary, United States Department of the Interior, Russell E. Dickenson, Director, National Park Service, James W. Coleman, Jr., Regional Director, National Park Service, Mid-Atlantic Region, and Don H. Castleberry, Deputy Regional Director, National Park Service, Mid-Atlantic Region, Appellees,

and

Marriott Corporation, Intervenor-Appellee.

No. 293, Docket 84–6207.

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1984.

Decided Jan. 25, 1985.

Philip M. Dixon, Albany, N.Y. (Philip H. Gitlen, Whiteman Osterman & Hanna, Albany, N.Y., of counsel), for appellants.

Frederick J. Scullin, Jr., U.S. Atty., N.D. N.Y., William P. Fanciullo, Asst. U.S. Atty., Albany, N.Y., for appellees.

Benjamin R. Pratt, Jr., Miller, Mannix, Lemery & Kafin, P.C., Glens Falls, N.Y., for intervenor-appellee Marriott Corp.

Before OAKES and KEARSE, Circuit Judges, and POLLACK, District Judge.*

OAKES, Circuit Judge.

This case presents the novel question whether amendment of a conservation easement acquired in part with federal funds under the Land and Water Conservation Fund Act of 1965 as amended, 16 U.S.C. §§ 460*l*-4 to 460*l*-11 (1982), so as to permit expansion of a golf course with limited access constitutes a conversion "to other than public outdoor recreation uses" under section 6(f)(3) of the Act, 16 U.S.C. § 460*l*-8(f)(3).[1] The Secretary of the Interior, acting through the National Park Service's Acting Regional Director, determined that a section 6(f)(3) conversion would not occur. Because the public does not have any access to the easement area, the United States District Court for the Northern District of New York, Roger J. Miner, Judge, held that limited access to the proposed golf course actually increased public outdoor recreation opportunities; consequently the Secretary's determination was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). 585 F.Supp. 195 We reverse and remand.

The Shawangunk Range, located in Ulster County, New York, is noted for spec-

---

* Of the Southern District of New York, sitting by designation.

1. Section 6(f)(3) provides:
No property acquired or developed with assistance under this section shall, without the approval of the Secretary, be converted to other than public outdoor recreation uses. The Secretary shall approve such conversion only if he finds it to be in accord with the then existing comprehensive statewide outdoor recreation plan and only upon such conditions as he deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

tacular rock formations, sheer cliffs, windswept ledges with pine barrens, fast-flowing mountain streams and scenic waterfalls, as well as a series of five mountain lakes, the "Sky Lakes." Of these, Lake Minnewaska is one, with extremely steep banks and many magnificent cliffs rising as high as 150 feet along its northern and eastern shores. Lake Minnewaska is situated approximately in the center on a general north-south line of 22,000 acres of permanent open space extending for some sixteen miles along the crest of the Shawangunks. Large tracts of land within the overall area are owned, maintained, and made available to the public for hiking and other limited recreational activities by, among others, the Village of Ellenville, the Palisades Interstate Park Commission (PIPC), the Mohonk Preserve, Inc., Mohonk Mountain Houses, Inc., and the Nature Conservancy.

In 1971, the State of New York purchased about 7,000 acres of land bordering Lake Minnewaska to the south and west for the formation of Minnewaska State Park. The park is under the jurisdiction and management of the PIPC, an interstate park commission formed by compact between the State of New York and the State of New Jersey.

In 1977, the PIPC added 1,609 acres of land to the park and purchased an approximately 239-acre conservation easement over Lake Minnewaska itself and certain land adjacent to it, all with the help of 50% federal matching funds from the Land and Water Conservation Fund. *See* 16 U.S.C. § 460*l*–8. The lands encumbered by the easement contain inter alia the lake itself, a nonoperating nine-hole golf course, a golf course pro shop, the water supply system for an adjacent resort building, and wooded land.

According to its terms, the easement is "for the purpose of, but not solely limited to, the conservation and preservation of unique and scenic areas; for the environmental and ecological protection of Lake Minnewaska and its watershed; and to prevent development and use in a manner in-

consistent with the present use and operation of lands now owned and to be conveyed [to the PIPC] and to be part of Minnewaska State Park." It provides that the fee owner "shall not develop or erect new facilities within the described area; alter the landscape or terrain; or cut trees" but may

> operate, maintain and reconstruct existing facilities within the easement area, including, but not limited to buildings, roads, utilities and golf courses; provided that (a) Any reconstruction shall be in the same location and utilized for the same purpose as that which existed on the date hereof and that such reconstructed facilities shall be no larger in area than the facility being replaced.

In a limited exception to the prohibition against expanded or new construction, the PIPC agreed to the construction or reconstruction of several specific facilities, including "[t]he existing golf course pro shop and a golf course maintenance building" as well as "[a]n access road and parking lot for golf course patrons."

The Marriott Corporation, a national hotel and resort developer, acquired an option in 1980 to purchase approximately 590 acres, including the water and lands encumbered by the 239-acre easement. Marriott proposes to develop a resort facility, complete with a 400-room resort hotel and conference center, 300 condominium units, restaurants, ski facilities, and an expanded, professional grade 18-hole golf course. Eight golf course holes and related facilities, apparently with golf-cart roadways, would be constructed on property subject to the easement.

Beginning in early 1981, the PIPC and the Mid-Atlantic Region of the National Park Service debated accommodating Marriott by amending the conservation easement. Friends of the Shawangunks, Inc., a New York not-for-profit corporation with approximately 600 members devoted to insuring the "preservation and prudent development of the Shawangunk Mountains in Ulster County, New York, as a natural resource for all to enjoy," and certain indi-

vidual members or "Friends" of the Shawangunks opposed the contemplated amendment. Attorneys for the Friends met with official representatives of the Mid-Atlantic Region on June 16, 1981, arguing both that the amendment would constitute a conversion under section 6(f)(3) requiring the approval of the Secretary of the Interior and that the conversion did not meet that section's criteria for approval.

Despite the Friends' arguments, the PIPC resolved on July 20, 1981, to amend the conservation easement to allow the Marriott Corporation to expand the golf course as proposed, drill wells within the easement area, increase the use of water from Lake Minnewaska, and utilize acreage encumbered by the easement for purposes of computing total average density of residential development. In consideration, Marriott agreed to extend the area covered by the easement, permit public access to footpaths through the easement area and adjacent lands owned by Marriott, maintain the lake level above an elevation of 1,643 feet, limit development on its other adjoining property, and open the golf course to the public twenty-five percent of the time. On October 20, 1981, defendant Don H. Castleberry, as Acting Regional Director of the Mid-Atlantic Region of the National Park Service, issued a letter to the Deputy Commissioner and Counsel of the New York State Office of Parks and Recreation officially notifying the PIPC that the contemplated amendment of the conservation easement did not constitute a section 6(f)(3) conversion and therefore did not require any federal authorization. This lawsuit followed.

The Friends commenced suit against the federal defendants on February 19, 1982. Marriott was granted leave to intervene and answer. After preliminary proceedings in which the plaintiffs were denied certain discovery, cross-motions were argued, and on April 2, 1984, the district court denied the Friends' motion for summary judgment and granted the federal defendants' and Marriott's motion for summary judgment, holding that the amendment did not constitute a conversion. The court reasoned that because the public had no access to the lands encumbered by the easement these lands "presently are not intended for outdoor, public, recreational use" within the meaning of the Land and Water Conservation Fund Act of 1965. Hence,

> [w]hatever limited public access is contemplated by the terms of the proposed amendment to that easement, therefore, must be viewed as nothing less than a bonus to the public, and not as a diminution in, or conversion of, the availability of public, outdoor, recreation facilities.

(Footnote omitted).

The Friends moved for reconsideration and for amendment of the judgment, but by order dated May 10, 1984, granting the motion for reconsideration, the court adhered to its original determination and denied the motion to amend the judgment.

## DISCUSSION

We agree with the Friends that the district court wrongly decided that the easement lands presently are "not intended for outdoor, public, or recreational use." Rather, in light of the policies of the Department of the Interior and the purposes of the statute, we interpret section 6(f)(3) "public outdoor recreation uses" broadly, to encompass uses not involving the public's actual physical presence on the property. After all, Webster's Third New International Dictionary (1971) defines "recreation" as "refreshment of the strength and spirits after toil," id. at 1899; surely by exposing scenic vistas and serving as a buffer zone between Minnewaska State Park and developed areas, the easement area provides such refreshment.

■ When faced with a problem of statutory construction, a court should show considerable deference to any reasonable interpretation given the statute by the officers or agency charged with its administration, especially where specialized agency understanding is involved. See Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22

(1980); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *accord Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, —— U.S. ——, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Capitano v. Secretary*, 732 F.2d 1066, 1075 (2d Cir., 1984) (on petition for rehearing). Here the Department of the Interior apparently agrees with the Friends that the term "public outdoor recreation uses" should be construed to include conservation easements such as the one at issue. Thus, the Department's Bureau of Outdoor Recreation Manual (Dec. 14, 1973) (hereinafter cited as Manual) indicates the Department's own broad construction of the Act, pointing out that acquisitions eligible for federal assistance as "lands and waters for public outdoor recreation," *id.* § 640.2.1., include "[n]atural areas and preserves and outstanding scenic areas where the objective is to preserve the scenic or natural values, including areas of physical or biological importance and wildlife areas," *id.* Outdoor recreation activities are defined to include "sightseeing" and "nature study." *Id.* § 640.2.2. The Department thus recognizes as present recreation uses the very uses that the original conservation easement protects and we are unable to find that such an interpretation is either unreasonable or contrary to Congress's intent.

True, a mere surface view of the Act itself seems to show that Congress intended primarily to increase opportunities for active physical recreation. The statement of purposes, for example, envisions "individual active participation in [outdoor] recreation." 16 U.S.C. § 460*l*–4. Concededly, much of the Act deals with admission and special recreation use fees, *see id.* §§ 460*l*–5a, –6a, –6b, again contemplating actual physical entry. However, both the legislative history and the Act itself reveal Congress's broader concerns.

The Senate Report prominently mentions the need to improve "the physical *and spiritual* health and vitality of the American people." S.Rep. No. 1364, 88th Cong., 2d Sess. 4 (1964), *reprinted in* 1964 U.S.Code Cong. & Ad.News 3633, 3636 (emphasis added). Similarly, when President Kennedy first transmitted to Congress the draft legislation on which the Act is based, his accompanying letter referred specifically to the preservation of "irreplaceable lands of natural beauty and unique recreation value" and to "the enhancement of spiritual, cultural, and physical values resulting from the preservation of these resources." Letter from President John F. Kennedy to Lyndon B. Johnson, President of the Senate, and John W. McCormack, Speaker of the House of Representatives (Feb. 14, 1963), *reprinted in* 1964 U.S.Code Cong. & Ad.News 3651, 3651.

It is after all a "conservation" fund act. Conservation may include, though it is by no means necessarily limited to, the protection of a present resource in its natural state. Indeed, the Act's stated purposes include "preserving" the "quality" of outdoor recreation resources. 16 U.S.C. § 460 *l*–4. The focus on preservation reappears in section 460*l*–9(a)(1), which authorizes allocation of funds for federal acquisitions both to protect endangered and threatened species and also, by reference to section 460k–1, to protect "natural resources."

 Thus, contrary to the district court's holding, the easement area presently *is* used for "public outdoor recreation uses," as that term of art was conceived by Congress and has been interpreted by the Interior Department. Having made this determination, we are next faced with the question whether the amendment at issue here constitutes a "conversion" of that easement to other than outdoor, public, recreation uses within the meaning of section 6(f)(3). Though the nature of a conservation easement makes the application of the concept of conversion somewhat elusive, we conclude that the proposed amendment does constitute such a conversion. The property acquired by PIPC through its purchase of the easement was the right to prevent further development of the land underlying the easement. By the proposed amendment, Marriott, the holder of the fee, would be permitted to engage in precisely

such development, changing both the character of the land and the population having access to it. By the amendment, in effect, PIPC would convey away its right to prevent any change in the character of the land subject to the easement. The view that such a change constitutes a "conversion" is supported by the Department of the Interior's own practice. In a May 15, 1978, Memorandum from the Director of the Department's Heritage Conservation and Recreation Service to all Regional Directors, delegating to them the conversion-approving function, the Director defined "conversion" to include instances in which "[p]roperty interests are *conveyed* for non-public outdoor recreation uses." (Emphasis added.) It is plain that there is a conversion from public enjoyment of an unspoiled area to private golfing.

What is the consequence of this determination? The Secretary, in the words of section 6(f)(3), must determine that the conversion is "in accord with the then existing comprehensive statewide outdoor recreation plan" and grant his approval "only upon such conditions as he deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location." These findings may seem simple, but they nevertheless must be made. Acting Regional Director Castleberry's letter stating that there was no conversion may not be treated as making them; though his letter did look to these very criteria, we cannot assume that he gave them the attention outlined in the above-mentioned Memorandum of May 15, 1978, which instructs regional directors to determine, for example, that "[a]ll practical alternatives to the conversion have been evaluated and rejected on sound bases," and that the fair market values of the property to be converted and of the property to be substituted have been established and compared. Thus, though Acting Regional Director Castleberry reviewed the New York State Department of Environmental Conservation's Draft Environmental Impact Statement on Marriott's project, which presumably considered the project's impact on the state's outdoor recreation plan, and though he implicitly found that the amended easement was "reasonably equivalent" to the original easement when he concluded "that none of the stated purposes for which the easement was acquired are defeated and that public recreation opportunities have been increased," Letter from Don H. Castleberry, Acting Director, National Park Service, Mid-Atlantic Region, to Albert E. Caccese, Deputy Commissioner and Counsel, New York State Office of Parks and Recreation (Oct. 20, 1981), we cannot assume, for example, that he made sure that *all* practical alternatives were considered and rejected (*e.g.*, whether the new golf holes could be built elsewhere on Marriott land), or that he established and compared the fair market values of the original and amended easements. We assume, rather, that Acting Regional Director Castleberry would engage in more careful scrutiny before approving a conversion than before determining, as he did here, that his approval was unnecessary.

Here we hold that the amended easement constitutes a conversion to "other than public outdoor recreation uses," 16 U.S.C. § 460*l*–8(f)(3), requiring the Secretary's approval. However, we would require approval by the Secretary in this case even if the Marriott Corporation planned to build a completely public outdoor recreation facility, because such a plan would be inconsistent with the original easement's prohibition of new facilities. Our reasoning runs as follows. The Act requires the Secretary to approve all "planning, acquisition, or development projects" before allocating federal funds. *Id.* § 460*l*–8(f)(1). It envisions that these "projects" will affect the future of the area acquired, preserving outdoor recreation opportunities for "present and future generations." *Id.* § 460*l*–4. Consistent with Congress's concern for lasting recreation opportunities, the Secretary approved federal funding for the Minnewaska easement in part because of the plans for the easement area's future—specific constraints on development and guarantees of environmental protection. Consequently,

any future change that contravenes these plans retroactively calls into question the basis for the original federal funding. Such a change necessarily requires the Secretary's approval, whether or not the change falls within the Act's definition of a "conversion." Otherwise, the Secretary's initial approval of a "project" extending into the future would be meaningless. Once again, it would not be enough for the Secretary to find that federal approval is unnecessary; while the statutory criteria for approval would not apply to a change from one public use to another, positive approval is still required.

We recognize with Marriott the rather cumbersome process involving a considerable amount of time and effort that undertaking this development has entailed. Marriott tells us that the project has been reviewed not just by the PIPC and the Department of the Interior, but also by the New York State Department of Environmental Conservation, the County of Ulster, the Town of Rochester, and the New Paltz Central School District, and several law suits have been filed. Unfortunately, or fortunately perhaps, the courts do not control the process, let alone establish it. When one undertakes to develop for private purposes a project involving the use of lands encumbered by a government interest, one's expectations are, or should be, that a certain amount of process and expense will be involved; presumably the anticipated rewards offset the cost and hassle, though surely the ultimate consumer will pay the cost of the benefit the process achieves, or there will be a hole in the developer's pocket. A court is left with the thought that one challenge of the years ahead is to cut down the process, thus lowering the cost, even while preserving the benefit. Meanwhile, the court's duty remains to follow the law as written and intended.

Since the decision moots the discovery issue briefed by the parties, we do not reach it.

Judgment reversed; cause remanded. The district court should enter judgment

prohibiting amendment of the easement without an appropriate determination by the Secretary as to the effect of conversion.