CITY OF JERSEY CITY; American Littoral Society; New Jersey Environmental Lobby; and New Jersey Public Interest Research Group, Inc., Plaintiffs,

v.

Donald P. HODEL, Secretary, United States Department of Interior; William P. Mott, Jr., Director, National Park Service; James W. Coleman, Jr., Regional Director, Mid–Atlantic Region, National Park Service; Liberty State Park Development Corporation; and Waterfront Developers Corporation, Defendants.

Civ. A. No. 88–3944.

United States District Court,
D. New Jersey.

June 8, 1989.

Susan C. Cassell, Asst. U.S. Atty., Newark, N.J., for defendants Donald P. Hodel,

Secretary, Dept. of Interior; William P. Mott, Jr., Director, National Park Service; and James W. Coleman, Jr., Regional Director, Mid-Atlantic Region, National Park Service.

Jeffrey A. Walder, Deputy Atty. Gen., Trenton, N.J., for defendant State of New Jersey, Dept. of Environmental Protection.

Christopher J. Paladino, Roseland, N.J., for defendant Liberty State Park Development Corp.

Charles DeFazio, Philadelphia, Pa., for defendant Waterfront Developers Corp.

Margaret M. Hayden and Edward Lloyd, of the Rutgers Environmental Law Clinic, Newark, N.J., for plaintiffs American Littoral Society, New Jersey Environmental Lobby, and New Jersey Public Interest Research Group, Inc.

Frank L. Holstein, Hackensack, N.J., for plaintiff City of Jersey City.

## OPINION

SAROKIN, District Judge.

In this action for declaratory and injunctive relief and to mandate and compel the Secretary of the Interior of the United States of America to enforce the requirements of United States Land and Water Conservation Fund Act, 16 U.S.C. §§ 460*l* –4 *et seq.* ("Conservation Act"), defendants move to dismiss the complaint. In addition, the New Jersey Department of Environmental Protection ("NJDEP") has moved to intervene in this action, and plaintiffs have cross-moved for permission to take depositions and discovery of various, undesignated public officials. None of the parties have opposed the NJDEP's request to intervene, and the court will grant this motion as unopposed.

## INTRODUCTION

Liberty State Park was acquired and improved largely through federal funds. It was established as a recreational oasis in a highly congested area at one of the most unique and symbolic locations in this country—facing the Statue of Liberty. Its acquisition and development were meant to preserve the open space, the vistas, and the tranquility of this rare parkland.

Plaintiffs seek to enjoin the construction of a private marina, to be operated for profit, encompassing fifty acres on the northern portion of the park. The sole issue now before the court is not whether the proposed marina violates the grant by which the park was established and constitutes a conversion of its authorized use, but whether that issue is now ripe for determination. No final decision having been made by the National Park Service, the court concludes that judicial intervention at this stage would be premature, and therefore inappropriate. However, the court finds it difficult to understand why the appropriate federal agencies cannot determine whether a marina of the type proposed is or is not a permissible use of the park without the need for further detailed and specific studies and the delays incident thereto. Certainly by now they should be able to determine the threshold question of whether they will or will not permit a private marina at this location, so that all interested parties, those in favor of and those opposed to the project, can be guided accordingly.

The issue has been squarely presented: Should a large portion of this park, built in the shadow of the Statue of Liberty, be devoted to mooring the boats of an affluent few or be preserved for the enjoyment of the huddled masses?

## BACKGROUND

This controversy has arisen over the development of Liberty State Park, which is located within the city of Jersey City in Hudson County, New Jersey. The dispute involves local, state, and federal agencies and officials, as well as corporate entities who have agreed to develop the park land and several public interest groups representing thousands of New Jersey citizens who oppose the planned development. Briefly stated, plaintiffs challenge a proposed marina project which defendants plan to construct in and around the northern embankment of the park, arguing that the marina constitutes an unauthorized conversion under the Conservation Act, 16 U.S.C. § 460*l* –8(f).

Plaintiffs' First Amended Complaint ("Complaint") alleges the following:

In 1965, plaintiff Jersey City donated one hundred and fifty acres of land to the State

of New Jersey for inclusion in Liberty State Park, to be used for open, public recreation purposes. Complaint @9. Liberty State Park is located in one of the most densely populated and congested areas in the United States, and at the present time these parklands provide the residents of Jersey City and the general public with "large, open greenspace and open, beautiful vistas for relief from the crowded, urban developments and projects where they reside." *Id.* at @@10–11.

The property upon which Liberty State Park now sits was purchased, improved and beautified with financial and other assistance provided in large part by the federal government, pursuant to the terms and conditions of the Conservation Act. *Id.* at @5. Beginning in 1980, the United States Department of the Interior and the National Park Service ("NPS") furnished approximately ten million dollars to the State of New Jersey for the acquisition of over three hundred acres of public parklands at Liberty State Park, including lands in the northern embankment, to be used as open greenspace and for public recreation. *Id.* at @18. Millions of additional dollars were furnished by the United States beginning in 1981, for the purposes of providing landscaping for open greenspace and lawns and for building promenades and walkway improvements to aid in the public's enjoyment of the scenic location. *Id.* at @31. The above financial assistance was furnished on the condition that the acquired and improved parklands would thereafter be used only for "open, public, passive recreation uses such as walking, jogging, picnicking, and enjoying the panoramic vistas and visual beauty of the New Jersey and New York Harbor and skyline," and that they would remain uncluttered by large on-land structures or "private restricted enclaves." *Id.* at @@19–20.

In addition, the federal funds were furnished on the condition that such parklands would be used in accordance with and to achieve the goals of the New Jersey State Comprehensive Outdoor Recreation Plan ("SCORP"). *Id.* at @21. SCORP outlines New Jersey's severe deficit of open areas for public recreation and labels seventy-five percent of the Hudson County population as being recreationally disadvantaged and in serious need of open greenspace for public recreation. *Id.* at @22. Under the terms of the federal grant to finance the acquisition and development of Liberty State Park land, future park uses were also required to comply with the final 1978 Environmental Impact Statement ("EIS") issued by the Department of the Interior, which emphasized the need to provide lower-income groups in Hudson County with an urban park containing open, public recreation space. *Id.* at @25.

Since the acquisition of the parklands comprising Liberty State Park, the fifty-acre north embankment area has been developed and for a number of years has been used by the public exclusively for open greenspace for passive recreation including walking, jogging, picnicking, and enjoying the vistas and sights of the harbor and New York skyline. *Id.* at @@27, 34.

The Complaint further alleges that the state of New Jersey has entered into a long-term lease with defendant Liberty State Development Corporation ("the Development Corporation"), a non-profit corporation, for lands at the northern portions of Liberty State Park, and that pursuant to this lease the Development Corporation plans to implement the construction of a marina complex on the fifty-acre north embankment area. *Id.* at @@75–76, 78. To implement its plan, the Development Corporation has entered into a sublease agreement with defendant Waterfront Developers Corporation ("Waterfront"), a commercial, for-profit corporation, for the construction and operation of the proposed marina complex. *Id.* at @@77, 79. The parklands upon which the marina complex is proposed to be built are lands which were acquired, improved and beautified with federal funds pursuant to the Conservation Act. *Id.* at @16.

Defendants' proposed marina would permit fifty acres of the northern portions of Liberty State Park to be used for "a large, profit-making, commercial Marina to consist of over Six Hundred (600) boat berths and slips, most of which will be for boats in

excess of thirty (30) feet in length." *Id.* at @12. In addition, defendants propose to permit construction on the same portion of the Park of a "large marina club house building; a large private parking lot; and a multi-story, large industrial building for both boat repairs and maintenance; and another large, multi-story building for boat storage; and large fuel tanks and refueling equipment and apparatus; and large industrial cranes and related equipment for the movement of boats from water to land and from land to water." *Id.* at @14. Most of the general public will be denied access to the above facilities, and most of the residents of Hudson County will be unable to afford to own or use boats of the size comtemplated under the proposal. *Id.* at @@12–14, 36, 46–49.

Plaintiffs allege that they have made repeated demands upon the public official defendants to declare that the proposed marina plans constitute an improper conversion under the Conservation Act but that the defendants have refused to take action to prohibit the construction of the marina development. *Id.* at @54. Defendant Coleman, an official of the National Park Service, had concluded in July of 1987 that the proposed marina complex might represent a change which contravenes the intended use for which the original federal grant was approved. *Id.* at @55. In August, 1987, after meeting with officials at the NJDEP, defendant Coleman advised the NJDEP that if certain changes were made with respect to the proposed marina complex, such revised proposal would not constitute a conversion under Section 6(f)(3) of the Conservation Act. *Id.* at @@62–63.

Plaintiff Jersey City corresponded with defendant Coleman in September of 1987 concerning the position-reversal of the NPS, and defendant Coleman responded by stating that NPS review of the proposed marina had not yet been completed and that plaintiff would be given a full opportunity to present its views on the conversion issue before a final ruling would be issued by the NPS. *Id.* at @@64–65. In the spring of 1988, after additional revisions of the proposed marina had been required by the NPS, plaintiff's representatives met with NPS representatives and were informed that the marina plans, as revised, would not constitute a conversion under the Conservation Act. *Id.* at @@68–69.

In June, 1988, plaintiff Jersey City attempted to administratively appeal the NPS determination regarding the conversion issue by sending a written request to defendant Hodel, Secretary of the Interior, to reverse the decision made by defendant Coleman. Id. at @70. In response, plaintiff was advised in July, 1988 by defendant Mott, Director of the NPS, that the NPS had made no final determination as to whether the proposed marina constituted an improper conversion. *Id.* Plaintiff Jersey City further alleges that in September of 1988, it was "finally advised by Defendant Coleman ... that the marina plan does not constitute an unlawful conversion," and that defendant Coleman further advised plaintiffs that the NPS had "made no determination as to whether any other aspects of the proposal require Park Service Approval." *Id.* at @72A. Finally, plaintiffs' Complaint alleges that all administrative remedies have been exhausted and that plaintiffs' demands have been "completely rejected by the public official defendants." *Id.* at @51.

Plaintiffs' complaint was filed in December, 1988. Personal service was made on all public official defendants, and no answers have been filed as of this date. Defendants now move to dismiss plaintiffs' complaint, arguing that the court lacks jurisdiction over the matter because there has been no final agency action by the NPS.

DISCUSSION

■ The issue to be decided by the court on defendants' motion to dismiss is whether it is appropriate for the court to exercise jurisdiction over this action at the present time. The Administrative Procedure Act, 5 U.S.C. § 704, states in relevant part:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in accord are subject to judicial review. A preliminary, procedural or intermediate

agency action or ruling not directly reviewable is subject to review on the review of final agency action....

In *Bell v. New Jersey,* 461 U.S. 773, 778, 103 S.Ct. 2187, 2191, 76 L.Ed.2d 312 (1983), the Supreme Court stated that there is a strong presumption that judicial review is only available when an agency action becomes final. Courts evaluating the issue of whether judicial review of an agency action is appropriate have framed the issue in terms of "ripeness". *See, e.g., Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Suburban Trails, Inc. v. New Jersey Transit Corp.,* 800 F.2d 361 (3d Cir. 1986).

The "ripeness" doctrine is meant to "avoid entangling courts in the hazards of premature adjudication." *Felmeister v. Office of Attorney Ethics,* 856 F.2d 529, 535 (3d Cir.1988), citing *Abbott Laboratories,* 387 U.S. at 148, 87 S.Ct. at 1515. As the Court stated in *Abbott Laboratories,* the purpose of the ripeness doctrine is to protect administrative agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148–49, 87 S.Ct. at 1515.

In *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515, the Court set out a two-part test for determining when it is appropriate for a court to hear an asserted claim arising from agency action. First, the court must determine whether the question is fit for judicial review. The issue of fitness is closely tied to whether an agency action is considered final, and the Court intimated in *Abbott Laboratories* that if an agency action was informal, only the ruling of a subordinate official, or tentative, it would not be fit for review by the court. *Id.* at 151, 87 S.Ct. at 1516. The NPS has represented through affidavits of its officials and through counsel that its determination of the conversion issue is still pending and is not yet final. Although some of the letters relied upon by plaintiffs as indications of the finality of the NPS's determination use language that connotes finality, most of such letters indicate that the determination remains preliminary. *See,* Exhibits F, G, H, P, Q, R, S, and T to Third Affidavit of Frank L. Holstein, Esq. In addition, defendants assert that an Environmental Impact Statement ("EIS") must still be acquired from the Army Corps of Engineers, and that the results of the EIS may cause the NPS to reevaluate its present position.

Plaintiffs argue that the agency review process is informal, with no official record to speak of, and that the NPS has indicated to them that it will not reconsider its determination that the plan is not a conversion. Thus, plaintiffs contend that, for all intents and purposes, the decision of the NPS is final and is ripe for review by this court. At the most, plaintiffs argue, any revisions in the plan will be to decrease the size of the project rather than enlarge it. Thus, if the current position of the NPS is that the plan is not a conversion, then future changes which decrease the size of the plan will not alter the NPS position and thus the decision is final. However, if this court were to determine that the now existing plan is a conversion before the final permits are obtained, it might then have to review every subsequent change to determine whether the change renders the plan acceptable. Such an ongoing review of agency decision-making is precisely what the requirement of finality is intended to preclude.

The second prong of the *Abbott Laboratories* test requires the court to evaluate the hardship to the parties if the court should withhold its consideration of the dispute. 387 U.S. at 149, 87 S.Ct. at 1515. Plaintiffs have alleged essentially two types of harm which might result if judicial review is delayed. First, plaintiffs have expressed concern that some or all of the defendants in this action may be able to successfully assert the statute of limitations defense if judicial review cannot be obtained until after the NPS issues a final decision. The court concludes, however, that a determination that the present action is not yet ripe for review based upon the assertions of defendants would by its very nature preclude a claim by any defendant in a later, identical action that plaintiffs

claims were barred by the statute of limitations.[1]

Second, plaintiffs contend that they and the general public are suffering hardship due to the delay in the determination by the NPS, in that the valuable park lands at issue are lying dormant pending approval or disapproval of the marina project. Plaintiffs contend that better, more appropriate uses of the land could be considered and implemented if the court were to decide at this time that the marina proposal would constitute a conversion. Although the court recognizes the important public interest in the use of the state's park lands, any proposed development of the land necessitates a certain degree of delay while the proposal works its way through administrative and bureacratic channels. Even if the court were to exercise jurisdiction over this action and find a conversion, there would be no assurance that such a decision would result in speedier alternative development of the park land. The fact that the future of the park remains in limbo while the NPS finalizes its decision is regrettable, but it is not the kind of harm that this court could redress even if it were to exercise jurisdiction.

 Certainly, if the "preliminary" determinations of the NPS that the proposed marina is not a conversion of the park lands were to have concrete consequences (i.e., if construction of the marina were scheduled to go ahead before the NPS deemed its determination to be "final"), this court would have jurisdiction to disregard the NPS' characterization of the determinations and to review the "preliminary" decisions. *See, e.g., Lam Man Chi v. Bouchard*, 314 F.2d 664, 670 (3d Cir.

1963) (finality of agency decision determined by "realistic appraisal of the consequences" of the decision); *Amerada Petroleum Corp. v. Federal Power Commission*, 285 F.2d 737 (10th Cir.1960). However, counsel for the NPS has represented to the court that no action can or will be taken on the proposed development of Liberty State Park until the NPS issues a final determination with respect to the issue of conversion.[2] On the basis of the above representations, the court is convinced that no irreparable harm will come to plaintiffs if the court were to refrain from exercising its jurisdiction until a final decision is made by the NPS.[3]

Since it is difficult to determine when the NPS decision-making process becomes final without some indication by the agency itself that its review is complete, the court concludes that this matter will not be ripe for judicial review until the agency determination, whether labelled "final" or "preliminary", is about to result in concrete action. At this point in the proceedings, any number of things could occur. For example, the Army Engineering Corps could withhold a permit and require substantial changes in the plan before issuing a permit.

 Although the court has concluded that the issue of whether the planned marina constitutes a "conversion" under the Conservation Act is not yet ripe for consideration by this court, the court also concludes that to dismiss this claim without providing plaintiffs with some assurance that they will be informed of the decision of the NPS as soon as it is made final would be an unduly harsh remedy given

---

1. If any defendant contends that it would not be so precluded, it shall inform the court and all counsel forthwith.

2. The court notes its agreement with plaintiffs' argument that the *Friends of Shawangunks* decision by the Second Circuit established a duty on the part of the Secretary of the Interior which goes beyond merely determining whether a proposed park land development constitutes a "conversion". Independently of the conversion issue, the Secretary is also required to approve any plan which is inconsistent with the originally-approved plans for the park lands. *Friends of*

*Shawangunks, Inc. v. Clark*, 754 F.2d 446, 451–52 (2d Cir.1985). As the Second Circuit stated, "any future change that contravenes these [original] plans retroactively calls into question the basis for the original federal funding. Such a change necessarily requires the Secretary's approval, whether or not the change falls within the Act's definition of 'conversion.'" *Id.* at 452.

3. Of course, plaintiffs will not be precluded from refiling their claims if it appears that concrete action is about to be taken on the park land before the NPS makes a final decision.

the important public interest in the underlying merits of the claim. *See, e.g., Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 241 (3d Cir.1980), *cert. denied, General Public Utilities Corp. v. Susquehanna Valley Alliance,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981). Thus, the court will order that defendants provide plaintiffs with prompt and timely written notice of (1) any public hearings regarding the proposed marina, (2) a final decision by the NPS regarding approval or disapproval of the proposed marina development, or (3) the date set by any defendant to commence any concrete action regarding the park land designated for the marina development, if such date falls prior to official notification of a final decision by the NPS. In addition, the defendants will be ordered to provide timely notice to plaintiffs when each of the permits, approvals, etc. required before the plan can be implemented has been issued.

The parties, in arguing the present motion, have made no reference to Count V of plaintiffs' First Amended Complaint, which is brought under the Freedom of Information Act. The court will thus dismiss only Counts I, II, III, and IV, which were brought under the Land and Water Conservation Fund Act.

Because the court will grant defendants' motion to dismiss the complaint with respect to Counts I, II, III, and IV, and because plaintiffs' cross-motions pertain to matters relating solely to those counts of the complaint which the court's order dismisses, plaintiffs' cross-motions for discovery will be denied.

CONCLUSION

The motion of the State of New Jersey, Department of Environmental Protection to intervene in this action is granted as unopposed.

Defendants' motion to dismiss the complaint is granted with respect to Counts I, II, III and IV of plaintiffs' First Amended Complaint, with the condition that defendants provide plaintiffs with notice of any public hearing, and the completion of NPS review and any decision resulting therefrom, or of any actions intended to be taken on the park lands in question which might occur before a final decision is made by the NPS, as well as notice of the issuance of any and all permits and approvals necessary for commencement of the marina project.

Plaintiffs' cross-motions are denied.