Laurie **GAROFALO** and Hilary Rosser, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**EMPIRE BLUE CROSS AND BLUE SHIELD,** Defendant.

No. 98 Civ. 3506(JSR).

United States District Court, S.D. New York.

Sept. 28, 1999.

Seth Richard Lesser, New York City, Clifford Cantor, Redmond, WA, F. James Donnelly, Denver, CO, for Plaintiffs.

Bartley J. Costello, III, Albany, NY, for Defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

The thinly-disguised premise of this lawsuit is that a New York health insurer should be penalized for adhering to the peculiarities of New York State health insurance law. That such a premise is contrary to common sense is obvious. To show that it is also contrary to applicable legal principles requires a bit more discussion.

On May 15, 1998, plaintiffs Laurie Garofalo and Hilary Rosser commenced this action against their health insurer, defendant Empire Blue Cross and Blue Shield ("Empire"), seeking under sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), to enforce certain contractual rights and to remedy certain fiduciary breaches. Specifically, plaintiffs alleged that defendant was paying less than its requisite eighty percent share of certain insured hospital and medical expenses.

By Consent Order dated September 29, 1998, the lawsuit was certified as a class action, with plaintiffs Garofalo and Rosser named as the class representatives. The class certified by the September 29 Order consists of:

> All participants and beneficiaries in ERISA-governed health or dental benefit plans, underwritten or administered by defendant Empire, for whom Empire made payments to hospitals or other health care providers pursuant to plans which included or includes a provision whereby Empire or the plans administered by Empire and/or a plan participant is or was responsible to pay a specified percentage of some or all medical or hospital bills for which the plan provides coverage; and whose claims are not barred by an applicable statute of limitations.

By Stipulation dated May 14, 1999, the parties contingently settled all class-wide claims relating to coverage for outpatient health services. The parties further agreed that subsequent actions by defendant had mooted plaintiffs' requests for injunctive relief. *See* Transcript of Hearing, June 15, 1999 ("Tr.") at 36. As a result, the only claims remaining were those seeking reimbursement of certain inpatient hospital costs paid by members of the class that plaintiffs claimed should have been paid by defendant.

Following discovery, each side moved for summary judgment in its favor on these remaining claims. For the reasons that follow, the Court grants defendant's motion and denies plaintiffs' motion.

Plaintiff Garofalo is covered by Empire's TraditionPlus Comprehensive Group Contract, which Empire insures and administers. *See* Maloney Aff. ¶¶ 6, 20–23, Exs. A, B. With respect to inpatient hospital expenses, the contract provides that after the insured participants, like Garofalo, have satisfied an initial "deductible," Empire is to pay 80% of "covered expenses" up to a certain limit, after which 100% is covered, and that the insured participants "are responsible for amounts not covered." *Id.*, Ex. B at 6. Plaintiff Rosser is covered by a health benefits plan sponsored by her employer, Merrill Lynch & Co., Inc., which similarly provides that, after the insured participants, like Rosser, have satisfied the basic deductible, the insurer is to pay "80% of the covered expenses" up to a certain limit, after which 100% is covered. *See*

Phillips Aff. ¶ 12; Pl.Ex. 8 at 5. While,.for most purposes, Merrill Lynch self-insures this plan and contracts with Empire to provide administrative services only, Empire itself insured participants for the hospital expenses here at issue pursuant to a "Required Operating Fund" agreement with Merrill Lynch. *See* Phillips Aff. ¶¶ 12–13; *see also* Def. 56.1 Statement ¶ 35.

It is undisputed that prior to January 1, 1997, Empire calculated its 80% coinsurance liability under these and similar plans on a different basis from that on which the participants' contributions were calculated. *See* Def. 56.1 Statement ¶ 28; Pl. 56.1 Statement ¶ 28. Specifically, each participant's contribution was calculated at 20% of the hospital's actual charges for that participant's hospitalization, while Empire's contribution was calculated at 80% of a statistical average rate for the hospital costs of the procedure at issue, known as the Diagnostic Related Group ("DRG") Rate. *See id.* The result was that, even though in each case the hospital always received 20% of its actual costs from the insured participant, in any given case it might receive more or less than 80% of its actual costs from Empire; but over many cases Empire's share would average out to 80% of actual costs as well.

This bimodal method for calculating co-insurance contributions was and is mandated, defendant asserts, by the New York Prospective Hospital Reimbursement Methodology ("NYPHRM"), codified at N.Y. Public Health Law § 2807–c. In pertinent part, this statute provides, at § 2807–c(11)(n)(i), that:

(A) the dollar value of such percentage coinsurance responsibility by or on behalf of [the] patient shall be determined by multiplying such coinsurance percentage by the hospital's charges for

such patient . . . and (B) the payment due to a general hospital for reimbursement of inpatient hospital services by [the] payor [i.e., the insurer] shall be determined by multiplying the [DRG Rate] . . . by the coinsurance percentage for which such payor is responsible, considering any applicable deductibles.

It is undisputed that at all times here relevant Empire's coinsurance calculation methodology conformed to § 2807–c(11)(n)(i). Plaintiffs assert, however, that in the case of a person covered by not-for-profit insurers like Empire, other provisions of the NYPHRM limit "the hospital's charges for such patient" to the DRG rate, so that the co-insurance responsibility of an Empire-insured participant should never exceed the participant's coinsurance percentage (typically 20%) multiplied by the DRG Rate, as it allegedly did in various instances here at issue. Alternatively, plaintiffs assert that, even if Empire's methodology was correct under New York law, ERISA preempts that law and requires Empire to adhere to what was actually represented in the plans that it insured, which, according to plaintiffs, were worded so as to lead a reasonable participant to understand that both the insurer's and the participant's respective percentage payments were calculated on the same basis.

Whatever the merits of these contentions, it follows from the fact that plaintiffs' remaining claims are now limited to recovering for alleged past overcharges of their portions of inpatient hospital charges that plaintiffs Garofalo and Rosser lack standing to pursue these claims, since neither suffered actual injury in respect to these claims.[1] *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S.

---

1. *A fortiori,* Garofalo and Rosser are inadequate representatives of the stipulated class with respect to these remaining claims. It does not follow, however, that they lacked standing to pursue the outpatient claims that have been contingently settled or that they cannot adequately represent the stipulated class with respect to the finalization of that settlement, since they are alleged to have suffered actual injuries with respect to those claims.

464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). Specifically, it is undisputed that, with respect to inpatient hospital claims, plaintiff Garofalo has never paid more than 20% of the DRG Rate. *See* Maloney Aff. ¶¶ 30–34, Exs. D, E; Def. 56.1 Statement ¶ 32; Pl. 56.1 Statement ¶ 32; Pl. Submission Regarding Standing, June 29, 1999, pp. 2–3; *see also* Tr. at 5. The same is true of plaintiff Rosser except with respect to a single hospital visit in June 1996 in connection with which she allegedly was billed $362 in excess of 20% of the DRG Rate. With respect to that visit, however, her entire bill was subsequently reimbursed under another health insurance plan maintained through her husband's employer, so that she suffered no actual out-of-pocket loss. *See* Pl. Submission Regarding Standing, June 29, 1999, pp. 3–4, Exs. B, C.

■■■ Rosser nonetheless argues that she still has standing to sue under the New York "collateral source" rule, which provides that tort damages "may not be reduced or offset by the amount of any compensation that the injured person may receive from a source other than the tortfeasor," *Oden v. Chemung County Indust, Develop. Agency,* 87 N.Y.2d 81, 85, 637 N.Y.S.2d 670, 661 N.E.2d 142 (1995); *see Stanley v. Bertram–Trojan, Inc.,* 868 F.Supp. 541, 542–43 (S.D.N.Y.1994). She fails, however, to cite a single case in which this doctrine has been applied to a claim brought under ERISA; and, in any event, the underlying nature of the remaining claims here at issue render the doctrine inapplicable. Specifically, to the extent Rosser's remaining claims are for breach of contract, the collateral source rule does not apply because "no one should profit more from the breach of an obligation than from its full performance," 22 Am.Jur.2d Damages § 568 (1988). *See also United States v. City of Twin Falls,* 806 F.2d 862, 873 (9th Cir.1986) ("The policy rationales underlying the collateral

source rule ... do not support its application to contract cases."). This leaves only her claims under ERISA for a fiduciary breach that she concedes was, at worst, neither purposeful nor negligent, *see* Tr. at 11. In these *no-fault circumstances,* it would be inequitable to apply the fault-premised collateral-source rule. *See generally* Restatement (Second) of Trusts § 201 cmt. c ("[T]he mere fact that [a trustee] has made a mistake of fact or of law in the exercise of his powers or performance of his duties does not render him liable for breach of trust.").

The unsettled claims must therefore be dismissed on the basis of plaintiffs' lack of standing. Anticipating this possibility, however, plaintiffs' counsel has represented that he could locate other members of the stipulated class who suffered actual injuries with respect to the remaining claims and who would be willing to serve as named plaintiffs and class representatives. Assuming *arguendo* that this proposal were otherwise acceptable, it must nonetheless be rejected on the ground of futility: for the Court, reaching the merits, concludes that, even if some plaintiffs (present or proposed) have standing to bring the remaining claims, the claims must still be dismissed as a matter of law.

■■■ Initially, this is because the methodology that Empire uses for calculating the participants' coinsurance payments under the plans that it insures or administers is the *only* methodology permitted under the applicable law, the NYPHRM. Thus, there are no "benefits due" or contractual "rights" to "enforce," "accountings" to be made, or "fiduciary breaches" to be rectified, because the benefits plaintiffs seek cannot exist by operation of law. Specifically, section 2807–c(11)(n)(i) requires that the calculation of patient coinsurance payments "shall" be based on actual hospital charges while calculation of the portion payable by insurers like Empire "shall" be based on the DRG Rate. The statute gives the insurer no discretion to vary this methodology, nor to contract around it. *See*

Memorandum in Support of Legislation, 1988 N.Y. Laws 605, discussed *infra.* New York law thus mandates the methodology for calculating both the insurer's and the participants' payments in this case, even assuming, *arguendo,* that the plans could be read to suggest a different scheme. *See UNUM Life Ins. Co. v. Ward,* 526 U.S. 358, 119 S.Ct. 1380, 1390, 143 L.Ed.2d 462 (1999) (holding that non-preempted state law controls parties' rights under health plan, notwithstanding directly contradictory plan language).

Thus, the plaintiffs' allegations that the language of the plans fails adequately to disclose the NYPHRM methodology and even misleadingly suggests that Empire's and participants' payments are calculated on the same base are ultimately irrelevant to the plaintiffs' remaining claims. Perhaps such allegations might support a claim for future injunctive relief to clarify the plans' language; but here that claim has been rendered moot by the withdrawal of plaintiffs' requests for injunctive relief—in part, the Court is informed, because certain clarifications in the plans' description of the calculation methodology have already been made. As to the past, plaintiffs do not seek recission but rather seek to require defendant to reimburse those participants who paid more than they would have if defendant, instead of following the NYPHRM, had calculated Empire's and the participants' payments on the same base in violation of New York law. In other words, plaintiffs seek a windfall beyond what the law entitles them to. This the law will not allow. *See UNUM,* 526 U.S. 358, 119 S.Ct. at 1390.

■ Independently, moreover, the alleged misrepresentations are immaterial. *See Ballone v. Eastman Kodak,* 109 F.3d 117, 122 (2d Cir.1997) ("[M]isrepresentations are material if they would induce a reasonable person to rely on them.") [2] Here, there is no claim that any plaintiff was induced to join a plan by its alleged mischaracterization of its calculation methodology or that any plaintiff would have opted out of that plan if the methodology had been accurately disclosed (assuming, *arguendo,* that it was not). Realistically, moreover, disclosure of the NYPHRM methodology could not have affected any New York plaintiff's health plan choices in any way because insurers in New York State were all required to, and in fact were, calculating benefits in this manner. *See* Billing Manual of the Hospital Association of the State of New York, Laks Aff., Ex. G, *see also* Gahan Aff.; Fitzgerald Aff., Ex. A, ¶ 13; Costello Aff., Ex. C, at 21. While plaintiffs' counsel hypothesized at oral argument (for the first time) that some participants, had they known of the

---

**2.** While in *Cavallo v. Utica–Watertown Health Ins. Co.,* 985 F.Supp. 72 (N.D.N.Y.), *reconsid. denied,* 3 F.Supp.2d 223 (1998), discussed *infra,* Magistrate Judge Hurd found similar claims to be material, this was in the context of claims for "declaratory, injunctive and other equitable relief," *id.* at 75, where materiality must partly be assessed on a forward-looking basis. In the instant case, by contrast, no equitable relief is available, forward-looking or otherwise. To begin with, plaintiffs, as noted, concede that their claims for injunctive relief have been mooted. Tr. at 36. Also, because plaintiffs have adduced no competent evidence that Empire profited from its methodology, plaintiffs' claims for an accounting, restitution, and other equitable relief under 29 U.S.C. § 1132(a)(3)(B) must be dismissed. *See Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18, 22 (2d Cir.1996) (no restitution liability without unjust enrichment); *see also In*

*re Evangelist,* 760 F.2d 27, 30 (1st Cir.1985) (Breyer, J.) (same, for restitution and accounting); *Kastle v. Steibel,* 120 A.D.2d 868, 869, 502 N.Y.S.2d 538 (1986) (per curiam) (same, for accounting). Finally, such equitable claims are not "appropriate" in this case in any event, *see* 29 U.S.C. § 1132(a)(3)(B), because relief for any injuries would already be available elsewhere, such as in a claim for "benefits due" under 29 U.S.C. § 1132(a)(1)(B). *See Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) ("Where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.' "); *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir.), *aff'd,* 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999).

methodology, would have chosen to be treated at hospitals with cheaper charges for inpatient care than the ones they actually chose, there is not an iota of evidence in the record to support the supposition that the marginal difference in calculating benefits would have materially affected this choice. Counsel's unsupported speculations are insufficient to sustain plaintiff's burden of evidentiary response at summary judgment. *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Plaintiffs raise a more fundamental objection to the above analysis, however, in that they contend that defendant did not follow the NYPHRM after all. This, they argue, is because even if Empire's methodology comported with the section of the NYPHRM most directly applicable, *i.e.,* § 2807–c(11)(n)(i), another section of the NYPHRM, *i.e.,* § 2807–c(12), "caps" the coinsurance responsibility of participants insured by not-for-profit insurers (as well as by health maintenance organizations) at their applicable percentage multiplied by the DRG rate. Thus, for participants insured by Empire, the participants' 20% coinsurance responsibility, though initially calculated, under § 2807–c(11)(n)(1), as 20% of the hospital's actual charges, may not, under plaintiffs' interpretation of § 2807–c(12), exceed in any instance 20% of the DRG Rate. On this theory, Empire's method of calculation, which followed § 2807–c(11)(n)(i) alone, failed to comply with the NYPHRM as a whole and resulted in at least some members of the class being overcharged.

Even on its face, this argument seems problematic, since it posits that some participants will reimburse the hospital for considerably less than their applicable percentage of the DRG Rate but that none will pay more than their applicable percentage of the DRG Rate. Since the DRG Rate is itself based on averaging, plaintiffs' interpretation guarantees that the hospitals will lose substantial sums. There is

no reason to suppose the legislature would have intended such a confiscatory result.

Moreover, the argument presupposes that not only Empire but also all other New York insurers and hospitals have for years ignored the legislative mandate of § 2807–c(12), since it is undisputed that all New York insurers and hospitals have uniformly calculated benefits under NYPHRM according to the same methodology used by Empire. Further still, as discussed *infra,* this is the same methodology expressly prescribed by the relevant New York administrative agencies. *See* Billing Manual of the Hospital Association of the State of New York, Laks Aff., Ex. G; *see also* Gahan Aff., Fitzgerald Aff., Ex. A. ¶ 13; Castelle Aff., Ex. C., at 21. According to plaintiffs, they all got it wrong.

The source of plaintiffs' argument—and its sole support—is Magistrate Judge Hurd's opinion in *Cavallo, supra,* 985 F.Supp. at 72, in which the Court took note of the fact that, even though § 2087–c(11)(n)(i) of the NYPRHM specifically compels participant coinsurance charges to be calculated on the basis of the actual hospital costs in that participant's particular case, § 2807–c(12) provides generally that hospital charges to participants for services insured · by certain classes of insurers, including not-for-profit organizations like Empire and also health maintenance organizations ("HMOs"), "shall not exceed the rates of payment approved by the commissioner for payments by [those insurers]," which at all times here relevant were the DRG Rates. The opinion in *Cavallo* sought to reconcile these two provisions by concluding that the legislature somehow sought to put a lower cap on what the hospitals could charge participants in not-for-profit and HMO plans than what it could charge other patients. *See Cavallo,* 985 F.Supp. at 81–82.

*Cavallo* does not meaningfully suggest, however, why the legislature might have so intended. At the time that § 2807–c(12) was enacted, it is estimated that al-

most 90% of the health-insured population in New York was covered by Empire, *see People v. Womans' Christian Ass'n of Jamestown, Inc.*, 44 N.Y.2d 466, 472, 406 N.Y.S.2d 272, 377 N.E.2d 725 (1978), so that the foreseeable impact on hospitals, if plaintiffs' interpretation were correct, would have been dramatic and confiscatory. An interpretation so rife with unlikely practical consequences is not readily to be accepted in the absence of any legislative history indicating that the legislature intended such consequences.

Moreover, plaintiffs' construction renders other provisions of the NYPHRM superfluous. For example, other provisions of the NYPHRM specifically "cap" what any New York hospital may charge any insured patient at 135% of the DRG Rate. *See* §§ 2807–c(1)(c) and 2807–c(11)(n)(i). This limit, which was designed to prevent price-gouging by hospitals without imposing on them a material financial disability, *see infra*, applies on its face to all categories of insureds (and, moreover, as described below, was enacted subsequent to § 2807–c(12)). Plaintiffs' theory that § 2807–c(12) imposes a cap of 100% of the DRG Rate on charges to Empire and HMO insureds, regardless of the subsequently-enacted general cap of 135%, not only renders the 135% cap superfluous for an estimated 90% or more of all insureds, but also fails to explain why the legislature wrote the 135% cap as a limit on all insureds generally rather than on the small class of insureds not capped by § 2807–c(12) as plaintiffs interpret it.

■ Put another way, plaintiffs' reading of § 2807–c(12) is seemingly inconsistent with the plain meaning of other provisions of the NYPHRM or, at the least, creates an ambiguity as to how the NYPHRM should be interpreted as a whole. This counsels resort to the pertinent legislative history. That history shows that § 2807–c(12) was passed, in 1978, not to set any particular cap but to prevent hospitals from avoiding rate limitations altogether by terminating their contracts with certain classes of insurers and charging participants directly. *See* Memorandum in Support of Legislation, Costello Aff., Ex. D. Indeed, at the time this provision was passed, the DRG Rate, which originated with the federal government, was not yet recognized in New York.

In 1988, New York adopted the DRG-based system of hospital reimbursement and, initially, required both participants and insurers to calculate their applicable coinsurance payments based on the DRG Rate. *See* 1988 N.Y. Laws, Ch. 2 (Laks Aff., Ex. E.). Shortly thereafter, however, in response to the complaints of some patients that, because of the averaging approach of the DRG Rate, they were paying large amounts for hospitalizations that in their particular cases had involved short stays well below the average, the prior legislation was amended, and § 2807–c(11)(n)(i) was enacted to require that patient coinsurance responsibility be based, instead, on actual hospital charges. *See* Memorandum in Support of Legislation, 1988 N.Y. Laws 605, Gahan Aff., Ex. A. This change was "designed to assure that individual patients are not unduly burdened by the obligation to make large coinsurance payments which may correctly reflect statistical patterns for the hospital industry as a whole, but are inordinate in relation to the services utilized by that particular patient." *Id.*

At the same time, the legislature recognized that, in order to make economic sense, this change necessarily entailed that some patients must pay more than their coinsurance percentage multiplied by the DRG Rate if their stays were longer than average or if they otherwise required more than average services; and, indeed, the Bill Jacket for § 2807–c(11)(n)(i) sets forth specific examples contemplated by the legislature of where patients would so pay when their costs of care exceeded the average. *See id.* So obvious and inherent was this possibility, and subsequent reality, that in 1990, in order to avoid price-gouging by hospitals, the legislature added

the final provisions capping the actual-charge base on which the participants' co-insurance responsibility was to be calculated at 135% of the DRG Rate. *See* 1990 N.Y. Laws Ch. 922.[3] This further amendment would have been entirely unnecessary for Empire and HMO patients (*i.e.*, the great majority of all patients) if the *Cavallo* theory were correct.

As the legislative history thus shows, any seeming inconsistency between § 2807–c(12) and § 2807(c)(11)(n)(i) reflects, at most, a legislative oversight in failing to recognize that the enactment and amendment of the latter might require amendment of the language of the former. But as § 2807–c(11)(n)(i) is both the more recently-enacted and the more specific provision, it clearly takes precedence over § 2807–c(12) with respect to any arguable conflict between the two. *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 991 (2d Cir.1990); *see also Bolar v. Frank*, 938 F.2d 377, 379 (2d Cir.1991).

As if that were not enough, deference must also be accorded, in resolving which provision to follow in calculating hospital charges under the NYPHRM, to the New York State Department of Health, the agency charged with implementing the statute, whose interpretation, as already noted, completely supports defendant's position. *See* Gahan Aff. *See generally Salvati v. Eimicke*, 72 N.Y.2d 784, 791, 537 N.Y.S.2d 16, 533 N.E.2d 1045 (1988) (per curiam); *Friends of Shawangunks, Inc. v. Clark*, 754 F.2d 446, 449 (2d Cir.1985).

Accordingly, the Court is obliged to reject *Cavallo* and conclude instead that Empire's method of calculation is the method required by New York law.

Plaintiffs' final argument is that the NYPHRM is preempted by federal ERISA law, and that, under the latter, the relevant calculations are determined by the face of the plans, which, plaintiffs' argue apply the same base to both the insurers' and the participants' share.[4] Once again plaintiffs' argument is unpersuasive.

The pertinent provisions of ERISA provide that it "shall supersede ... State laws" to the extent that those laws "relate to any employee benefit plan" unless they are laws that "regulate[ ] insurance." 29 U.S.C. § 1144(a), 1144(b)(2)(A). Although the Supreme Court has previously ruled that certain parts of the NYPHRM—the provisions setting surcharge reimbursement rates by type of payor—do not even "relate to" employee benefit plans (and are, therefore, not preempted by ERISA), *see New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the Court here need not consider whether the provisions at issue in the instant case are similarly excluded, because it finds that, in any event, these provisions "regulate insurance" and are therefore saved from preemption on that ground.

A state statute "regulates insurance," from a common-sense standpoint, where it "homes in on the insurance industry," *UNUM*, 526 U.S.358, 119 S.Ct. at 1386–87. This category includes, *inter alia*, "laws that regulate the substantive terms of insurance contracts," *Metropolitan Life Ins. Co. v. Com. of Massachusetts*, 471 U.S. 724, 741–42, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). *See also Washington Physicians Serv. Assoc'n v. Gregoire*, 147 F.3d 1039, 1045 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1033, 143 L.Ed.2d 42

---

**3.** Unlike the severe limits on actual charges that plaintiffs posit of 100% of the DRG Rate, a 135% cap is not materially confiscatory but simply imposes a modest upper limit. In economic terms, it is the difference between allowing market forces to operate except at the extremes versus interfering with market forces in roughly half of the cases.

**4.** On this theory, the present stipulated class (described above) would have to be narrowed, since some members of that class, far from incurring added costs, would have realized a windfall.

(1999). The laws here at issue expressly center on those insurance contracts providing "percentage coinsurance responsibility" and seek by legislative decree to set certain terms of those contracts. For example, as noted, they require that a participant's coinsurance liability *must* be based on actual hospital charges and that the insurer's contribution *must* be based on the DRG Rate. They are thus closely analogous to so-called mandatory benefit statutes that, by inserting substantive terms in insurance contracts, have uniformly been held to "regulate insurance." *See Metropolitan*, 471 U.S. at 741–42, n. 18, 105 S.Ct. 2380; *see also Washington Physicians Serv.*, 147 F.3d at 1045.

While the provisions on their face also cover entities beyond those traditionally considered to be "insurance companies," such as HMOs and payors under the Workers' Compensation laws and similar laws, *see, e.g.*, § 2807–c(1)(a)–(b), this is of no moment because, unlike laws of general applicability, *see, e.g., Prudential Ins. Co. v. National Park Medical Center*, 154 F.3d 812, 829 (8th Cir.1998), the provisions here in issue only regulate such payors to the extent they are parties to coinsurance contracts and thus, in effect, are acting as insurers under classic insurance arrangements. *See Washington Physicians Service*, 147 F.3d at 1045–46 (holding that HMOs and other health contractors, even if not "traditional" insurance companies, operate in the "business of insurance" and function as insurance companies).

While the provisions also extend to self-insured plans, which under ERISA are not considered to be in the business of insurance, *see* 29 U.S.C. § 1144(b)(2)(B), this is incidental at most and would only warrant preemption, if at all, as to the NYPHRM's application to such plans. *See Metropolitan*, 471 U.S. at 736 n. 14, 105 S.Ct. 2380 (statute regulates insurance even though, as written, it also encompasses self-insured funds).[5]

Thus, on any "common sense" view, the portions of the NYPHRM here at issue regulate insurance. The same result obtains, moreover, if one applies the three factors of the so-called "McCarran–Ferguson" test often invoked to help make such determinations. *See UNUM*, 526 U.S. 358, 119 S.Ct. at 1386. Regarding the first factor—whether the law transfers or spreads a participant's risk—the effect of the two-tiered method of coinsurance computation mandated by NYPHRM is to govern material aspects of the spreading of risks of hospital costs faced by the parties. Regarding the second factor—whether the law is integral to the relationship between the policyholder and insurer—the provisions here at issue directly mandate and define certain terms in the coinsurance contracts. Finally, even assuming, *arguendo*, that the third factor—whether the regulation is limited to insurance entities—weighs in favor of preemption because of the incidental inclusion of self-insured plans, it would do so, at most, slightly, because the provision primarily "homes in" on insurance companies and other entities acting in their role as insurers.

The Court has carefully considered plaintiffs' other arguments but finds them to be without merit. Accordingly, for the reasons stated herein, defendants' motion for summary judgment on all the non-settled claims is granted, plaintiffs' motion for summary judgment on the same claims is denied, and all of the claims based on inpatient hospitalizations are hereby dismissed with prejudice. The parties are ordered to jointly call Chambers by no later than October 15, 1999 to schedule final settlement-approval proceedings as to the previously-settled claims.

SO ORDERED.

---

**5.** The Supreme Court in *Metropolitan* considered the state statute's treatment of self-insured and other plans to be severable, so that even if the regulation were preempted as to the self-insured plans the remainder of the regulation was still within the savings clause. *Id.*