

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2003

# Emilien v. Stull Tech Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-1422

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Emilien v. Stull Tech Corp" (2003). *2003 Decisions.* Paper 359.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/359

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO.  02-1422
_____

BERTHONY EMILIEN, Individually
and as Personal Representative
of MARIE EMILIEN, deceased

Appellant

v.

STULL TECHNOLOGIES CORP.;
SEABOARD LIFE INSURANCE CO.


_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. No. 99-cv-05312
(District Judge: Dennis M. Cavanaugh)

_____

Argued: April 29, 2003

Before: BECKER, *Chief Judge,*[*] RENDELL and AMBRO, *Circuit Judges*

(Filed: July 18, 2003)


NOEL C. CROWLEY (Argued)

_____

[*]Judge Becker completed his term as Chief Judge on May 4, 2003.

1

Crowley & Crowley
20 Park Place, Suite 206

Morristown, NJ 07960

*Attorney for Appellant Berthony Emilien*

KARL FENSKE (Argued)
26 Park Place
Morristown, NJ 07960

*Attorney for Appellee Stull Technologies*

Michael C. Pelletier (Argued)
Suite 104
31 Fairmount Avenue
P.O. Box 700
Chester, NJ 07930

*Attorney for Appellee Seaboard Life Ins. Co.*

—————————————————

OPINION OF THE COURT
—————————————————

BECKER, *Circuit Judge.*

This is a medical and severance benefits case with an ERISA facet. Plaintiff

Berthony Emilien ("Berthony"), the husband of the late Marie Emilien ("Marie"),

commenced this action in the District Court for the District of New Jersey against

defendant Stull Technologies ("Stull"), Marie's employer, and Seaboard Life Insurance

Co., provider of Marie's life insurance policy, both as an individual and as Marie's duly-

appointed personal representative. Stull had decided to close the plant at which Marie

worked, but it offered her enrollment in a Special Severance Program ("SSP") under which it would provide her with medical benefits through the end of the month following her termination, as well as a severance package, so long as she worked continuously through November 6, 1998. Marie was unable to do so, as she was hospitalized on October 21, 1998. During that hospitalization, Stull claims to have sent to her a letter dated October 30 that contained two critically important pieces of information: (1) notice of her termination (and its date); and (2) notice that, due to her termination, she would be excluded from Stull's group life insurance plan and would need to file a Consolidated Omnibus Budget Reconciliation Act ("COBRA") conversion notice in order to maintain coverage. Although Stull received no reply from Marie, it terminated her medical benefits in accordance with the letter, and since Marie did not effect COBRA conversion, she found herself with no coverage.

Berthony sued Stull to regain the lost benefits, alleging that Stull in fact never sent the October 30 letter in which it announced Marie's termination, noting, *inter alia*, that Stull has been unable to produce a certified mail receipt for the letter. He also contended that, under the terms of the SSP, Marie qualified for severance pay even if Stull terminated her, as the SSP provides for severance if the employee worked through November 6 *or* was "released at an earlier date" by Stull. (279a.) Finally, Berthony alleges a year-long delay in receiving requested ERISA plan documents, which ERISA provides should be produced within thirty days, and seeks ERISA's $100-per-day penalty

3

for that delay.  The District Court granted summary judgment for Stull on all counts, and Berthony appeals.

Because we are satisfied that Stull's COBRA notice (which was contained in the October 30 letter it may have mailed to Marie) was legally insufficient to discharge Stull from liability for Marie's medical expenses, we will vacate the District Court's grant of summary judgment and order Stull to pay those expenses, assuming (as described below) it determines that New Jersey courts would apply the collateral source rule.  As to whether Stull is liable for Marie's expenses incurred through November 30 or December 31, while the District Court may have erred in choosing November 30 rather than December 31, Berthony failed to raise this argument before the District Court, so we will not set the judgment aside on this basis.  We do, however, bring the matter to the District Court's attention so that it may grant Berthony leave to amend his complaint if it deems such a step appropriate.  If it does not, the November 30 cutoff date is affirmed.  We will remand to the District Court the question whether Stull should pay ERISA's $100-per-day penalty for its failure timely to provide Berthony with requested ERISA plan documents.

Stull's argument that Berthony fully mitigated his damages by enrolling Marie in the U.S. Healthcare plan was not adequately briefed by either side.  Although it appears likely that New Jersey courts would nevertheless allow Berthony to recover under the collateral source rule, the New Jersey Supreme Court has not resolved the question, nor

4

did the District Court consider it. We will therefore not decide the matter; rather, we will remand it to the District Court with instructions that it allow briefing to resolve the question.

Finally, we will set aside the District Court's grant of summary judgment to Stull on the question whether Marie should receive severance pay, and remand that issue to the District Court for further proceedings to determine the nature of Marie's "termination" on October 21 and the legal effect of that termination, if any, on her eligibility for severance pay.

## I. Facts and Procedural History

In 1998, Stull, a manufacturer of injection-molded closures for use in industry, decided to shut down its facility in Randolph, New Jersey, where Marie worked, and to transfer its operations to another Stull plant located in Somerset, New Jersey. The decision was announced by letter to Marie and other Randolph-based employees on August 18, 1998 ("the August 18 letter"). At the same time, Stull sent to these Randolph employees a separate letter ("the companion letter") in which it extended offers of continuing employment to those who advised management in writing by September 4, 1998, of their willingness to work at the Somerset location. The companion letter explained that, for those who did not transfer, employment with Stull would terminate on November 6, 1998. With a view to retaining non-transferring employees' services up to that date, the letter announced a Special Severance Program under which certain benefits

5

would be extended to those who worked through the plant's closure on November 6. To qualify for those benefits, employees were required to signify their acceptance of the SSP not later than October 12, 1998, by executing a "General Release and Waiver Agreement" through which they surrendered wrongful-discharge and other employment-related claims. The terms of the SSP also required them to render satisfactory service at the Randolph location "on a continuous basis from now until November 6, 1998 or until released on some earlier date by Stull." (279a.) On September 1, 1998, Marie executed a written statement declining Stull's offer of employment at its Somerset location. On October 11, 1998, she submitted her timely written election to participate in the SSP.

Although we presume that Marie intended to work through November 6 so as to meet the SSP's terms, illness prevented her from doing so. Approximately two years earlier, in October of 1996, she had been diagnosed with HIV and tuberculosis, and these maladies had caused her absence from work on many occasions throughout 1997 and 1998, including a hospital stay in February of 1998. After that hospitalization, her doctor described her as being "up and down" until October 21, 1998, approximately two weeks before the Randolph plant closure. On that day, she was severely stricken while at work, and was transported by ambulance to the Morristown Memorial Hospital. She returned to her home for a time, although she remained unable to work. She was hospitalized once again on December 28, 1998, and remained there until her death on January 7, 1999.

6

Shortly after Marie became ill on October 21, Loretta Goldstein, a senior representative of Stull's Human Resources Department, composed a letter to Marie bearing the date of October 30, 1998 ("the October 30 letter"). (144a.) The letter stated that Stull had decided retroactively to "separate" Marie as of October 21, the day she was stricken. There is some dispute, however, as to whether the letter was actually mailed. It bears a notation stating "Mailed 11/2/98," (163a), but Goldstein admitted that she had no actual recollection of mailing that particular letter. (162a.) Instead, she stated that she relied on her regular practice of taking letters of that nature to a particular inter-office location for mailing by someone else. (*Id.*) Also, although Goldstein represents that Stull customarily sends such letters by certified mail (144a), Stull has not been able to produce either the "white" receipt issued by the Post Office when it accepts certified mail, or the "green" receipt showing that it was duly delivered and received. (126a, 162a, 180a.) Berthony denies that either he or Marie ever received such a letter, stating: "I feel certain no such letter arrived at our home." (103a.)

The letter, if mailed, was the only means by which Stull informed Marie (who was hospitalized at the time) of her termination. Equally important, it was the means by which Stull sought to discharge its statutory duty to inform Marie that, due to her termination, she would be excluded from the company's group medical benefit plan and would have to complete and return COBRA election forms if she wished to retain medical insurance protection. (165a.) It also included forms with which Marie could

7

have applied for state disability benefits. (144a, 162a.) Since Marie did not return the COBRA election or state disability forms — Berthony, as noted, argues that Marie never received them — her medical coverage terminated in November of 1998.

Even without the October 30 letter, Marie might have learned of the need to undergo COBRA conversion had Stull, and Goldstein in particular, engaged in their regular (albeit voluntary) notification procedures. In her testimony, Goldstein acknowledged that it was Stull's usual practice (and her own personal responsibility) in the case of former employees who had not been heard from in response to COBRA conversion notices to investigate the matter by telephoning them. (180a.) In this instance, Goldstein stated, no call was made to Marie, and she blames the tumult created by the closing of the Randolph facility. (180a.) She did, however, admit her knowledge of Marie's health problems and that those problems would have made continuous insurance coverage critical. (*Id.*)

Assuming *arguendo* that Stull mailed the October 30 letter, there is also a dispute regarding its legal effect — Goldstein was unsure whether it terminated Marie as of October 21, or if it instead placed her on disability leave of absence. She first testified that the October 30 letter's references to Marie's "separation" meant that Marie had been terminated, and that the October 30 letter was intended as her official notice of termination. But later, in discussing a related issue, Goldstein testified that Marie did not qualify for severance pay because on November 3, "she was on a leave of absence."

8

(174a.) To Stull, the distinction is critical, for the SSP conditions severance pay on employees "remaining employed by Stull on a continuous basis from now until November 6 or until released on some earlier date by Stull." Further, only those employees who are not "on a Leave of Absence, regardless of length of service, as of the Inactive Date" are eligible for the SSP. (279a.) Stull submits that, as it terminated Marie on October 21, she did not fulfill the condition precedent to qualification for severance pay, namely working until November 6. Berthony, however, contends that Marie qualified for severance pay regardless of whether the October 30 letter placed her on leave of absence or terminated her — if it placed her on leave of absence, she was still employed on a continuous basis, and if it terminated her, that constituted an "earlier release" by Stull.

At all events, Berthony represents that neither he nor Marie learned of her termination or insurance cutoff until November of 1998, when he sought prescription medicine from a pharmacy and was told that his insurance had been cancelled. (102a.) He contacted the Stull Human Resources Department, which stated that Marie had been informed of her benefit cancellation via the October 30 letter. (102a-103a.) Berthony protested that the cutoff was inappropriate regardless of the purported notice in that letter, for under the terms of the SSP, an employee's enrollment in the group medical benefit plan continues until the end of the month *following* her inactive date, which was alleged to be November 6, 1998. (281a.) Under this interpretation, Stull was accountable

9

for the $23,095 in medical costs incurred through December 31, 1998. Stull, however, submits that the SSP extended regular health insurance only to the end of the month *of* the inactive date, *i.e.*, until November 30.

In an attempt to clarify the situation, Berthony requested from Stull a copy of the October 30 letter, but no copy was produced. (105a.) Meanwhile, as a stopgap measure, Berthony applied to include his wife in the group medical plan offered by his own employer, Amphenol Corporation, through United Healthcare. Although United stated that it would not cover Marie until January 1, 1999, the bills from Marie's hospital care show that United nevertheless paid for her expenses following the November 30 cutoff of the insurance provided by Stull. Stull argues that United's replacement coverage deprives Berthony of constitutional standing, for all of Marie's bills were paid. Berthony responds that New Jersey's collateral source doctrine does not allow gratuitous payments by third parties to deprive plaintiffs of standing to prosecute an alleged refusal to pay in the first instance.

Berthony brought suit against Stull and Seaboard Life Insurance Co. ("Seaboard") in the District Court for the District of New Jersey under ERISA Section 502 and N.J.S.A. 17B:27-51.12, challenging the lawfulness of denying Marie medical, severance and life insurance benefits.[1] He also sought attorneys' fees and a statutory penalty of

---

[1] After Marie's death in January of 1999, Berthony submitted a claim form to Seaboard Life Insurance Co. by certified mail. Seaboard signed a return receipt and returned it to Berthony. The amount of the policy was $5,000. Seaboard denied liability

10

$100 per day for Stull's alleged failure to provide him with ERISA plan information.

The parties cross-moved for summary judgment, and the District Court granted Stull's

and Seaboard's motions. Berthony now appeals from that judgment. The District Court

had jurisdiction under 29 U.S.C. § 1331, and we exercise appellate jurisdiction pursuant

to 29 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is

plenary. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 566 (3d Cir. 2002).

## II. Discussion

### A. Did Marie Waive Her Right to Medical Coverage?

Stull argues that the SSP, which Marie signed and returned, constituted a bargain

in which Marie waived any right to sue Stull over employment-related claims in

exchange for severance pay and Stull's promise to pay her another month's medical

benefits. Stull insists that it upheld its end of the bargain — it paid benefits through

November 30. Although Marie did not receive severance pay, an issue discussed more

fully below, Stull asserts that Marie was not contractually entitled to it because she did

not fulfill the condition precedent of working through November 6.

Berthony responds that the SSP's waiver does not protect Stull, for each of

---

on the ground that Marie "was not employed at Stull Technologies at the time of her
demise." (214a.) After briefs were submitted in this case, however, the parties reached a
settlement agreement under which Seaboard will pay to Berthony, in his representative
capacity, the full $5,000 policy amount. We therefore need not discuss this issue further,
except to order that Seaboard pay the $5,000 it offered in settlement. We also note that
we find Berthony's claim for attorneys' fees to be without merit.

11

Berthony's claims arose subsequent to Marie's acceptance of the waiver, which occurred on October 11, 1998. He submits that our precedents refuse to recognize waivers of claims arising in the future. *See Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n. 27 (3d Cir. 1975) (holding that prospective waivers of claims are void as against public policy). Moreover, he asserts that Stull's concept of waiver, taken seriously, would be perverse, as it would prevent Berthony from challenging the very exchange that gave rise to the waiver that Stull now uses against him.

We are satisfied that the SSP's waiver presents no obstacle to Berthony's claim. New Jersey public policy forbids prospective waivers of any right to sue, and that is precisely what is at issue here. *See Becker v. Sherwin Williams*, 717 F. Supp. 288, 293 (D.N.J. 1989) ("[E]ven if such a release had been signed by plaintiff, plaintiff would not be precluded from asserting claims which arose after the execution of the general release."); *Three Rivers*, 522 F.2d at 896 n.27. This is doubly true when, as here, the consideration for the waiver is a future benefit that the employer fails to provide.

**B. Assuming *Arguendo* that the October 30 Letter Was Sent, Was the COBRA Notice Contained Therein Sufficiently Clear?**

Berthony argues that even if Stull mailed the October 30 letter, the notice it contained respecting Marie's right to continued medical coverage under COBRA was inadequate and did not fulfill Stull's statutory obligation under 29 U.S.C. § 1166(a)(1) to give accurate and understandable information on COBRA conversion. Under COBRA,

12

an employee opting to convert from group to private medical insurance must be given a minimum of 60 days in which to do so. 29 U.S.C. § 1165. This time runs either from the occurrence of a "Qualifying Event," a statutorily-defined term, or from notice to the beneficiary, whichever is later. Termination is usually the "Qualifying Event." If this COBRA conversion notice is deficient, the employer remains liable for an employee's medical costs incurred pursuant to the employer's group plan.

The October 30 letter, if mailed, contained a form titled "COBRA ELECTION FORM AND NOTICE," but Berthony argues that even if Marie had received it, it was insufficiently clear to put her on notice of her rights. Although it referred to a 60-day time period and a "Qualifying Event," the notice did not define "Qualifying Event." Berthony therefore contends that Stull failed to discharge its statutory duty to "explain the circumstances which may result in disqualification or denial of loss of benefits." 29 U.S.C. § 1022(b), and to do so "in a manner that is calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a)(1).

We are satisfied that Stull's COBRA notice was insufficiently clear to discharge Stull from liability for Marie's health costs. This is because it is highly unlikely that a lay person would understand the meaning of the term "Qualifying Event" without any explanation of that term. Indeed, we note that the wording was sufficiently opaque that it confused even Loretta Goldstein, Stull's plan administrator. In her deposition, when asked where in the conversion form one is given an amount of time in which to convert,

13

she stated: "Well, my interpretation of this form states that they have forty-five days." (167a.) A forty-five day conversion period, of course, would violate 29 U.S.C. § 1165, which requires a minimum of sixty days. Because Stull failed to provide Marie with a readily comprehensible COBRA conversion form, it is liable for her health costs.[2]

## C. Does Stull's liability for Marie's health costs extend through November 30, 1998, or December 31, 1998?

Stull argues that, even if Marie was entitled to medical benefits under the SSP, she was only entitled to benefits through November 30, 1998, not December 31, 1998. It reasons that Marie's situation is governed by subsection c, which states:

> If you do not accept Stull's offer of continued employment at its Somerset facility and do not make the SSP election in the manner described above, your group health care will cease *at the end of the month of your Inactive Date*. You must continue to make contributions while this coverage is in effect, even if the level of contribution subsequently changes.

(281a) (emphasis added). As Marie's inactive date was November 6, Stull submits that her coverage ended on November 30, 1998, and that it is therefore not liable for the $23,095 in expenses incurred through December.

---

[2] Because we conclude that any COBRA conversion notice that Stull might have sent to Marie was legally insufficient to discharge it from liability, we need not decide whether, for summary judgment purposes, Stull actually *did* send that form to Marie. We note, however, that it is doubtful that Stull would prevail on the strength of its records. Although it asserts that it sent the October 30 letter (which contained a COBRA conversion notice) by certified mail, it has been unable to produce any certified mail receipt for that letter. (126a, 162a) Moreover, Loretta Goldstein has no specific recollection of mailing that letter, (162a), and Stull did not demonstrate the regularity of its mailing procedures.

14

Berthony, however, contends Stull relies upon the wrong section of its plan in arguing that Marie's December expenses were not covered. Subsection c, rescribed above, applies only to employees "who do not make the SSP election." Marie plainly did make that election by signing the "General Release and Waiver Agreement and Acceptance of the Randolph SSP." (274a-275a, 279a.) For those in her position who signed and returned the SSP election form, subsection b governs, and it states:

> If you do not accept Stull's offer of continued employment at its Somerset facility and make the SSP election in the manner described above, your group health care coverage will cease *at the end of the month following your Inactive Date*. You must continue to make contributions while this coverage is in effect, even if the level of contribution subsequently changes.

(281a) (emphasis added).

Although Berthony's argument may well have merit, the record reflects that he failed to raise it before the District Court, and it is therefore not properly before us. We will not set the judgment aside on this basis, but leave to the District Court the question whether to grant Berthony leave to amend his complaint to include this claim; if it does not, the judgment to this extent is affirmed.

**D. Can Marie prove damages?**

Stull asserts that even if it failed to provide Marie with a comprehensible COBRA conversion form, it should nonetheless prevail because Marie has suffered no damages due to Stull's denial of medical benefits. As noted above, Berthony testified that when Stull dropped his coverage, he transferred Marie to a plan provided by his employer,

15

Amphenol Corporation, through United Healthcare. Although United initially stated that it would not cover Marie until January 1, 1999, the bills from Marie's hospital care show that United nevertheless paid for her $23,095 in expenses that followed Stull's November 30 cutoff date. Stull submits that because Berthony obtained from United the same coverage he would have enjoyed under Stull's plan, he incurred no costs due to any error Stull might have committed. As Stull puts it, "No harm, no foul." (Stull Br. at 13.)

Although Stull's argument is not without intuitive appeal, it was not supported by legal authority. Indeed neither side adequately briefed the possibile applicability of the New Jersey collateral source rule. As one New Jersey court stated, it is "the general rule that one obligated to pay because of a wrong done, or an obligation incurred by contract, may not benefit by payments or medical services rendered to the injured party from collateral sources." *Lapidula v. Government Employees Ins. Co.*, 146 N.J. Super. 463, 467 (1977). *See also Ronson v. Talesnick*, 33 F. Supp. 2d 347, 354 (D.N.J. 1999). While the rule has been modified by statute, the modification applies only to civil actions for personal injury or death. N.J.S.A. 2A15-97. In an analogous context, the Eleventh Circuit, confronting a potential double recovery by an insurance claimant, nevertheless allowed a full recovery since that was the amount the defendant should have paid as the primary insurer. *See National Companies Health Plan v. St. Joseph's Hospital*, 929 F.2d 1558, 1574-75 (11th Cir. 1991). The court noted that the double recovery was unlikely to stand, as separate and independent efforts were underway by the secondary insurer to

16

recover the sums in question. *Id.* Here, too, United would certainly have a cause of action to recover sums wrongfully paid to Berthony for Marie's expenses.

It is worth noting that after briefs were submitted to this Court, we stated in *Burstein v. Retirement Health Plan for Employees of Allegheny Health Education and Research Foundation*, No. 02-2666, that "[c]laims for ERISA plan benefits under ERISA § 502(a)(1)(B) are contractual in nature." If *Burstein* were interpreted to mean that all claims in ERISA cases were essentially contractual, Stull might validly argue that Berthony is entitled to no recovery because he successfully mitigated his damages when he enrolled in the United Healthcare plan. But this might read too much into *Burstein*, where the quoted statement was made in the context of a dispute over construction of the terms of a discrete plan.

Although it appears likely that New Jersey employs the collateral source rule, the Supreme Court of New Jersey has not resolved the question, and it was not briefed in the District Court.[3] Furthermore, it was analyzed only superficially in the briefs submitted to

---

[3] Judge Rendell questions whether the views of the Supreme Court of New Jersey are relevant to the analysis of this federal claim for benefits under ERISA, and more generally whether tort principles such as the collateral source rule are applicable to claims, such as these, that are "contractual in nature." *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. and Research Found.*, __ F.3d __, 2003 WL 21509028, at *12 (3d Cir. 2003). In addition, she believes that Emilien's complete mitigation of damages likely negates any entitlement to recovery for plan benefits under ERISA. *See*, *e.g.*, *Garofalo v. Empire Blue Cross & Blue Shield*, 67 F.Supp.2d 343, 347 (S.D.N.Y. 1999). She nonetheless joins in the Court's opinion as it does not foreclose the District Court from considering these issues on remand.

this Court. We therefore direct that, on remand, the District Court allow supplemental briefing and argument to resolve this question.

**E. Was Marie Entitled to Severance Pay?**

Stull's SSP, which Marie signed and returned, promised that Stull would grant severance pay to Marie, although it provided that "this severance pay is conditioned on . . . you remaining employed by Stull on a continuous basis from now until November 6 or until released on some earlier date by Stull." Further, only those employees who are not "on a Leave of Absence, regardless of length of service, as of the Inactive Date" are eligible for the SSP. (279a.) Marie was hospitalized on October 21 and, on October 30, Stull separated her and made the separation retroactive to October 21. Stull argues that because she was separated on October 21, she did not fulfill the condition of working until November 6 and was therefore not entitled to severance pay. There is, however, disagreement as to whether this "separation," as the October 30 letter referred to it, was in fact a termination or whether it was a medical leave of absence. Goldstein first testified that the October 30 letter's reference to "separation" meant that Marie had been terminated, and that the October 30 letter was meant to memorialize that action. (164-65a.) But later in her testimony, Goldstein testified that as of November 3, 1998, "she was on a leave of absence." (174a.)

Berthony contends that he is entitled to a judgment under either interpretation. If Marie was merely placed on leave of absence, he notes, she would still be an employee

18

and would therefore be entitled to the medical benefits denied to her by Stull. But if she was terminated as of October 21, the position Stull adopts, Berthony submits that Marie's termination would constitute an "earlier release" by Stull that would qualify her for severance pay under the SSP. It is not clear, however, that she would be eligible for the SSP if she were on a leave of absence as of the Inactive Date. (279a.) He argues that any other interpretation would allow Stull to render impossible Marie's fulfillment of the "work until November 6" condition. *See Epright v. Environmental Resources Mgmt, Inc. Health and Welfare Plan*, 81 F.3d 335, 341 n.1 (3d Cir. 1995) ("Just as in contract law, failure to satisfy a condition should be excused if the other party thwarted fulfillment of the condition."). Stull responds that "[o]bviously the company wanted employees to work right up to the closure of the plant. Severance pay was the incentive to do so." (Stull Br. at 6.) It contends that Marie's inability to work, unfortunate though it may have been, was not Stull's fault, and that it therefore cannot be said to have thwarted Marie's fulfillment of the contractual condition.

Although the District Court concluded that Marie "was not qualified for severance pay since she did not meet the requirements of the SSP agreement," summary judgment is inappropriate in the face of the disagreement that existed among Stull's own employees regarding whether Marie's separation was a termination or medical leave of absence. We will therefore vacate the District Court's grant of summary judgment in favor of Stull on the matter of Marie's eligibility for severance pay, and remand the issue

19

to the District Court for further proceedings.  On remand, the District Court should first resolve this question of status.  If it determines that Marie was terminated on October 21, it should then assess whether, as a contractual matter, her termination rendered her ineligible for severance pay, or if instead it merely constituted a contractual "earlier release" that nevertheless qualified her for severance pay.  If it determines that Marie was on a leave of absence, it should assess whether she is ineligible for severance pay under the terms of the SSP.  (279a.)

## F.  Should Stull Pay ERISA's $100-Per-Day Penalty for Failing to Respond to Requests for a Summary Plan Description?

Berthony alleges that Stull failed to respond to his repeated requests for a summary description of Stull's benefits plan pursuant to ERISA, 29 U.S.C. § 1024(b)(4), and he seeks damages pursuant to 29 U.S.C. § 1332(c), which states:

> Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

A claimant seeking this penalty need not demonstrate that the failure to respond caused actual harm — a showing of noncompliance is itself sufficient.  *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1148 (3d Cir. 1993).  Likewise, a claimant need not

20

demonstrate bad faith by the plan administrator, for the statute penalizes a *failure* to comply with a request as well as a *refusal* to comply with a request.

The record reflects that Berthony sent a written request to Stull on July 27, 1999, asking for a copy of the October 30 letter so that he might assess his legal options. He repeated the request on August 9, 1999. (188a, 189a.) Stull did not respond to these requests. On August 20, 1999, Berthony's counsel sent a letter to Stull specifically requesting the summary plan description for employee medical plans, and this letter mentioned explicitly ERISA's $100-per-day penalty for noncompliance. (190a.) Although Stull responded to the August 20 letter on August 25, 1999, it failed to include a copy of the SSP, a document critical to ascertaining participants' rights under the plan.

Although Berthony's attorney sent a follow-up letter on August 30, 1999, calling Stull's attention to this omission and requesting a copy of the SSP, (193a), Stull did not respond. Indeed, Stull did not produce a copy of the SSP until Berthony had filed his complaint, and even then it first produced only a template copy that omitted key details such as the "Inactive Date," which the user of the form was instructed to insert in response to an "insert date" instruction contained in the form itself. The inadequacy of this version is evidenced by the fact that Loretta Goldstein, when asked to interpret the form, testified that the Inactive Date was November 3, 1998, when it was in fact November 6, 1998. (172a-173a.) Ginny Condello, Stull's Human Resources Director, testified that she found a complete copy of Marie's SSP while undertaking an unrelated

21

search on August 17, 2000; Stull produced this complete copy on October 4, 2000, as part of its own motion for summary judgment. (261a-262a.) In total, Berthony received on October 4, 2000, a copy of a document he specifically requested on August 20, 1999, a delay of at least thirteen months for a production that ERISA expects to occur within 30 days. 29 U.S.C. § 1332(c).

Stull responds that it did the best that it could under the circumstances. It explains that:

> Stull was undergoing a total reorganization and force reduction at the time that [Marie] left her job. Not only did the plant shut down, but all management and plant operations were consolidated under one roof, in Somerset New Jersey. The Randolph plant's human resources staff left Stull as well as many of the plant employees. To make matters even more problematic, from a record keeping perspective, the new Human Resource personnel had to deal with the destruction of many of the employee records due to a flood. So not only were all the records moved to a new location, but new people were administering those records and many of the records were destroyed. Furthermore, Stull is not a Fortune 500 company. It can easily be inferred that a company that has to consolidate into one location from three and significantly reduce its staff is not enjoying the best of times.

(Stull Br. at 23.)

Although we are sympathetic to the idea that a company weathering financial distress might be less culpable than one that is simply dilatory in the face of a request for plan documents, the statute is not so forgiving. Rather, we believe that sanctions are appropriate under these facts. Stull did not produce even a template copy of the SSP until Berthony filed a formal complaint, and even then it was nearly a year before Berthony obtained a copy of the SSP from which he could glean the specific information

22

needed to establish his rights. This is not a situation where a plan administrator tried diligently to accommodate a beneficiary while conducting a search for the missing documents — it located Marie's SSP only while hunting for an entirely unrelated set of documents. This nonchalance falls directly within the behavior that § 1332(c) is intended to penalize, for as noted above, that section condemns not only an administrator who *refuses* timely to provide plan documents, but also one who *fails* timely to provide those documents.

We will set aside the District Court's determination that ERISA's penalty is inappropriate in this situation. Of course, because the District Court concluded that a penalty was inappropriate, it had no occasion to consider the proper size of such a penalty should one be awarded. We will therefore remand this matter to the District Court, which is presumably more familiar with the case's tenor and nuances than is this Court. *Inter alia*, since bad faith can be a factor in determining the size of the penalty, the District Court may want to consider its existence *vel non*.

### III. Conclusion

For the foregoing reasons, we will vacate the District Court's grant of summary judgment in favor of Stull and remand so that it may consider the effect, if any, of New Jersey's collateral source rule on Berthony's mitigation of his damages through enrollment in the U.S. Healthcare plan. We will remand to the District Court the question of the amount Stull should pay per day as a penalty for its failure timely to

23

provide Berthony with requested ERISA plan documents.

Finally, we will set aside the District Court's grant of summary judgment to Stull on the question whether Marie should receive severance pay, and remand that issue to the District Court for further proceedings to determine the nature of Marie's "termination" on October 21 and the legal effect of that termination, if any, on her eligibility for severance pay

TO THE CLERK:

Please file the foregoing opinion

_____/s/ Edward R. Becker_
Circuit Judge

DATED: July 18, 2003