

Villanova University School of Law
Villanova University School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-23-2006

# Emilien v. Stull Tech Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3148

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Emilien v. Stull Tech Corp" (2006). *2006 Decisions*. Paper 1063.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1063

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 04-3148

BERTHONY EMILIEN, Individually
and as Personal Representative
of MARIE EMILIEN, deceased

v.

STULL TECHNOLOGIES CORPORATION;
SEABOARD LIFE INSURANCE CO.


Stull Technologies Corporation,

Appellant

Appeal from the United States District Court
for the District of New Jersey
(Civ. No. 99-cv–5312)
District Judge: Hon. Dennis M. Cavanaugh

Submitted pursuant to Third Circuit LAR 34.1(a)
March 27, 2006

Before: McKEE and VAN ANTWERPEN, Circuit Judges,
and POLLAK, Senior District Judge[*]

(Opinion filed: May 23, 2006)

OPINION

McKEE, Circuit Judge.

---

[*]The Hon. Louis H. Pollak, Senior District Judge for the United States District
Court for the Eastern District of Pennsylvania, sitting by designation.

1

Stull Technologies Corporation appeals from the district court's rulings in favor of Berthony Emilien, individually and as Personal Representative of the Estate of Marie Emilien, Deceased. The district court ruled on Berthony's claim against Stull seeking medical insurance payments on behalf of Marie under the Employee Retirement Income Security Act ("ERISA"). For the reasons that follow, we will dismiss the appeal and remand to the district court for any further proceedings consistent with this opinion that that court may deem appropriate.

## I. FACTS

The facts are taken directly from our not precedential opinion in *Emilien v. Stull Technologies Corp.*, 70 Fed.Appx. 635 (3d Cir. July 18, 2003):

In 1998, Stull, a manufacturer of injection-molded closures for use in industry, decided to shut down its facility in Randolph, New Jersey, where Marie worked, and to transfer its operations to another Stull factory located in Somerset, New Jersey. The decision was announced to Marie and other Randolph-based employees on August 18, 1998 ("the August 18 letter"). At the same time, Stull sent to these Randolph employees a separate letter ("the companion letter") in which it extended offers of continuing employment to those who advised management in writing by September 4, 1998, of their willingness to work at the Somerset location. The companion letter explained that, for those who did not transfer, employment with Stull would terminate on November 6, 1998. With a view to retaining non-transferring employees' services up to that date, the letter announced a Special Severance Program ("SSP") under which certain benefits would be extended to those who worked through the plant's closure on November 6. To qualify for those benefits, employees were required to signify their acceptance of the SSP not later than October 12, 1998, by executing a "General Release and Waiver Agreement" through which they surrendered wrongful-discharge and other employment-related claims. The terms of the SSP also required them to render satisfactory service at the Randolph location "on a continuous basis from now until November 6, 1998 or until released on some earlier date by Stull." On

2

September 1, 1998, Marie executed a written statement declining Stull's offer of employment at its Somerset location. On October 11, 1998, she submitted her timely written election to participate in the SSP.

Presumably, Marie intended to work through November 6, 1998 so as to meet the SSP's terms. However, illness prevented her from doing so. Approximately two years earlier, in October of 1996, she had been diagnosed with HIV and tuberculosis, and these maladies had caused her absence from work on many occasions throughout 1997 and 1998, including a hospital stay in February of 1998. After that hospitalization, her doctor described her as being "up and down," until October 21, 1998, approximately two weeks before the Randolph plant closure. On that day, she was severely stricken while at work, and was transported by ambulance to the Morristown Memorial Hospital. She returned to her home for a time, although she remained unable two work. She was hospitalized once again on December 28, 1998, and remained there until her death on January 7, 1999.

Shortly after Marie became ill on October 21, Loretta Goldstein, a senior representative of Stull's Human Resources Department, composed a letter to Marie bearing the date of October 20, 1998 ("the October 30 letter"). The letter stated that Stull had decided retroactively to "separate" Marie as of October 21, 1998, the day she was stricken. There is some dispute, however, as to whether the letter was actually mailed. It bears a notation stating "Mailed 11/2/98," but Goldstein admitted that she had no actual recollection of mailing that particular letter. Instead, she stated that she relied on her regular practice of taking letters of that nature to a particular inter-office location for mailing by someone else. Also, although Goldstein represents that Stull customarily sends such letters by certified mail, Stull has not been able to produce either the white receipt issued by the Post Office when it accepts certified mail, or the green receipt showing that it was duly delivered and received. Berthony, Marie's husband, denies that either he or Marie ever received such a letter.

That letter, if mailed, was the only means by which Stull informed Marie (who was hospitalized at the time) of her termination. Equally important, it was the means by which Stull sought to discharge its statutory duty to inform Marie that, due to her termination, she would be excluded from the company's group medical benefit plan and would have to complete and return Consolidated Omnibus Budget Reconciliation Act ("COBRA")

3

election forms if she wished to retain medical insurance protection. It also included forms with which Marie could have applied for state disability benefits. Since Marie did not return the COBRA election or state disability forms, her medical coverage terminated in November of 1998.

Even without the October 30 letter, Marie might have learned of the need to undergo COBRA conversion had Stull, and Goldstein in particular, engaged in their regular (albeit voluntary) notification procedures. Goldstein testified that it was Stull's usual practice, and her own personal responsibility, in the case of former employees who had not been heard from in response to CORBA conversion notices to investigate the matter by telephoning them. In this instance, Goldstein stated that no call was made to Marie and she blamed the tumult created by the closing of the Randolph facility. She did, however, admit her knowledge of Marie's health problems and that those problems would have made continuous insurance coverage critical.

Assuming *arguendo* that Stull mailed the October 30 letter, there is also a dispute regarding its legal effect – Goldstein was unsure whether it terminated Marie as of October 21, or if it instead placed her on disability leave of absence. Goldstein first testified that the October 30 letter's references to Marie's "separation" meant that Marie had been terminated, and that the October 30 letter was intended as her official notice of termination. But later, in discussing a related issue, Goldstein testified that Marie did not qualify for severance pay because on November 3, "she was on leave of absence."

To Stull, the distinction is critical, for the SSP conditions severance pay on employees "remaining employed by Stull on a continuous basis from now until November 6 or until released on some earlier date by Stull." Further, only those employees who are "not on a Leave of Absence, regardless of length of service, as of the Inactive Date" are eligible for the SSP. Stull submits that, as it terminated Marie on October 21, she did not fulfill the condition precedent to qualify for severance pay, namely working until November 6. Berthony, her husband, contends that Marie qualified for severance pay regardless of whether the October 30 letter placed her on leave of absence or terminated her – if it placed her on leave of absence, she was still employed on a continuous basis, and if it terminated her, that constituted an "earlier release" by Stull.

4

In any event, Berthony represents that neither he nor Marie learned of her termination or insurance cutoff until November of 1998, when he sought prescription medicine from a pharmacy and was told that his insurance through Stull had been cancelled. He contacted the Stull HR Department, which stated that Marie had been informed of her benefit cancellation via the October 30 letter. Berthony protested that the cutoff was inappropriate regardless of the purported notice in that letter, for under the terms of the SSP, an employee's enrollment in the group medical benefit plan continues until the end of the month following her inactive date, which was alleged to be November 6, 1998. Under this interpretation, Stull was accountable for the $23,095 in medical costs Marie incurred through December 31, 1998. Stull, however, submits that the SSP extended regular health insurance only to the end of the month of the inactive date, i.e., until November 30.

In an attempt to clarify the situation, Berthony requested from Stull a copy of the October 30 letter, but no copy was produced. Meanwhile, as a stopgap measure, Berthony applied to include Marie in the group medical plan offered by his own employer, Amphenol Corporation, through United Healthcare. Although United stated that it would not cover Marie until January 1, 1999, the bills from Marie's hospital care show that United nevertheless paid for her expenses following the November 30 cutoff of the insurance provided by Stull. Stull argued that United's replacement coverage deprives Berthony of constitutional standing, for all of Marie's bills were paid. Berthony responded that New Jersey's collateral source rule does not allow gratuitous payments by third parties to deprive plaintiffs of standing to prosecute an alleged refusal to pay in the first instance.

70 Fed.Appx. at 637-40.

## II. PROCEDURAL HISTORY

On November 12, 1999, Berthony sued Stull and Seaboard Life Insurance Company individually and in his capacity of personal representative of Marie's estate. Berthony brought the suit under ERISA § 502, and N.J.S.A. 17B:27-51.12. The suit alleged that defendants improperly denied Marie medical, severance and life insurance

benefits.[1]  It also sought attorneys' fees and a statutory penalty of $100 per day for Stull's alleged failure to furnish ERISA plan information.  The district court thereafter granted summary judgment in favor of Stull, and Berthony appealed.  We reversed explaining:

> Because we are satisfied that Stull's COBRA notice (which was contained in the October 30 letter it may have mailed to Marie) was legally insufficient to discharge Stull from liability for Marie's medical expenses, we will vacate the District Court's grant of summary judgment and order Stull to pay those expenses, assuming (as described below) it determines that New Jersey courts would apply the collateral source rule.  As to whether Stull is liable for Marie's expenses incurred through November 30 or December 31, while the District Court may have erred in choosing November 30 rather than December 31, Berthony failed to raise this argument before the District Court, so we will not set the judgment aside on this basis.  We do, however, bring the matter to the District Court's attention so that it may grant Berthony leave to amend his complaint if it deems such a step appropriate.  If it does not, the November 30 cutoff date is affirmed.  We will remand to the District Court the question whether Stull should pay ERISA's $100-per-day penalty for its failure timely to provide Berthony with requested ERISA plan documents.
>
> Stull's argument that Berthony fully mitigated his damages by enrolling Marie in the U.S. Healthcare plan was not adequately briefed by either side.  Although it appears likely that New Jersey courts would nevertheless allow Berthony to recover under the collateral source rule, the New Jersey Supreme Court has not resolved the question, nor did the District Court consider it.  We will therefore not decide the matter; rather, we will remand it to the District Court with instructions that it allow briefing to resolve the question.
>
> Finally, we will set aside the District Court's grant of summary judgment to Stull on the question whether Marie should receive severance pay, and remand that issue to the District Court for further proceedings to determine the nature of Marie's "termination" on October 21 and the legal

---

[1]After Marie's death, Berthony submitted a claim form to Seaboard, which issued a $5,000 life insurance policy to Marie through Stull.  Seaboard initially denied liability, but ultimately the parties settled the claim and Seaboard paid Berthony the $5,000.

effect of that termination, if any, on her eligibility for severance pay.

70 Fed.Appx. at 637.

On remand, the district court held (1) that the collateral source rule[2] applies and therefore, Berthony can recover health insurance benefits from Stull[3] even though Berthony's carrier paid Marie's medical bills;[4] (2) that Stull should pay a daily penalty totaling $13,195 for the 377 days it failed to provide Marie with requested ERISA plan documents;[5] (3) that Marie was terminated and, therefore, not entitled to severance pay;

---

[2]Generally, the collateral source rule states that "one obligated to pay because of a wrong done, or an obligation paid by contract, may not benefit by payments or medical services rendered to the injured party from collateral sources." *Lapidula v. Government Employees Ins. Co.*, 146 N.J. Super. 46, 467 (App. Div. 1977).

[3]The district court found that the cutoff date for Marie's medical expenses was November 30, 1998 because Berthony did not amend his complaint.

[4]The total amount of Marie's medical bill was $23,095.99.

[5]With regard to the request for certain ERISA plan documents, we noted:

The record reflects that Berthony sent a written request to Stull on July 27, 1999, asking for a copy of the October 30 letter so that he might assess his legal options. He repeated the request on August 9, 1999. (188a, 189a.) Stull did not respond to these requests. On August 20, 1999, Berthony's counsel sent a letter to Stull specifically requesting the summary plan description for employee medical plans, and this letter mentioned explicitly ERISA's $100-per-day penalty for noncompliance. (190a.) Although Stull responded to the August 20 letter on August 25, 1999, it failed to include a copy of the SSP, a document critical to ascertaining participants' rights under the plan.
Although Berthony's attorney sent a follow-up letter on August 30, 1999, calling Stull's attention to this omission and requesting a copy of the SSP, (193a), Stull did not respond. Indeed, Stull did not produce a copy of the SSP until Berthony had filed his complaint, and even then it first produced only a

(continued...)

7

and (4) that Stull should pay attorneys' fees and prejudgment interest.[6]

Stull then filed this appeal.

## III. DISCUSSION

Although the posture of this case would suggest that Stull would be challenging the district court's legal rulings on remand, Stull does not now attack those rulings. Rather, for reasons known only to Appellant's counsel, Stull now claims that issues pertaining to the collateral source rule and the amount of the medical payments due are "mooted," *see* Stull's Br. at 11, that "no penalties were warranted . . .', *Id.* at 16, that attorney's fees, costs and interest should not have been awarded, *id.* at 18, and that the district court never "docketed or resolved defendant's motion and ignored defendant's

---

[5](...continued)
template copy that omitted key details such as the "Inactive Date," which the user of the form was instructed to insert in response to an "insert date" instruction contained in the form itself. The inadequacy of this version is evidenced by the fact that Loretta Goldstein, when asked to interpret the form, testified that the Inactive Date was November 3, 1998, when it was in fact November 6, 1998. (172a-173a.) Ginny Condello, Stull's Human Resources Director, testified that she found a complete copy of Marie's SSP while undertaking an unrelated search on August 17, 2000; Stull produced this complete copy on October 4, 2000, as part of its own motion for summary judgment. (261a-262a.) In total, Berthony received on October 4, 2000, a copy of a document he specifically requested on August 20, 1999, a delay of at least thirteen months for a production that ERISA expects to occur within 30 days. 29 U.S.C. § 1332(c).

70 Fed.Appx. at 645.

[6]The district court, in an order entered after issuing its decision on the merits, awarded fees and costs in the amount of $109,135.43.

objections to the . . . " award of medical expenses, attorney's fees and prejudgment interest. *Id*., at 19.

However, Stull's real contention on appeal seems to be that its medical insurance carrier, NJBC Indemnity Group (Blue Cross/Blue Shield), paid all of Marie's medical expenses, and that they were not paid by United Healthcare, the medical insurance carrier for Berthony's employer. *Id.* at 12-13. Stull then proceeds to further muddy the jurisprudential waters by claiming that Berthony's attorney fraudulently represented to the district court and to us that Marie's medical bills were paid by United Healthcare rather than NJBC Indemnity. *Id.* at 14. Stull raised these issues on remand by way of a motion filed pursuant to Fed.R.Civ.P. 60(b), seeking relief from judgment or order on the basis that it had new evidence that the medical bills were paid by its insurance carrier. While it appears that motion was, for some reason, never docketed, it is clear that the district court considered it. At a hearing on June 14, 2004, the district court said:

> I don't think I have any authority at all to start rehearing that which the Third Circuit has already ruled upon. I think that Judge Becker made it very clear as to what this Court was to do, and I'm sticking to the parameters of what the Third Circuit has told me.

Tr. p.8, line 8.

We have already ruled that Stull's defective COBRA notice renders it liable for medical benefits in the amount of $23,095, subject only to the district court's determination of the applicability of the collateral source rule. We have also ruled that Stull failed to produce the summary plan description as required by statute, and Stull is

9

not now challenging the district court's calculation of that penalty. Stull does argue that the district court "never docketed or resolved [its motion for attorney's fees or interest] and ignored [its] objections to the quantification of the medical expense award, attorney fees and prejudgment interest." Appellant's Br. At 19. Our prior opinion resolved plaintiff's entitlement to attorney's fees and prejudgment interest, and we are now at a loss in attempting to fathom a legal basis for Stull's apparent attempt to revisit that issue based upon the docket entries in the district court.

Rather than attempt to forge some legal argument from the ethers of Stull's allegations, we will dismiss this appeal and again remand this matter to the district court for any additional proceedings that court may deem appropriate in view of Stull's allegations of fraud.